UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
FLORENCE DIVISION

| | | |
|---|---|---|
| Jimmie Callum, Jr., | ) | Civil Action No.: 4:14-cv-3481-RBH |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **ORDER** |
| | ) | |
| CVS Health Corporation; South | ) | |
| Carolina CVS Pharmacy, LLC; | ) | |
| CVS Pharmacy, Inc.; Mark Cosby; | ) | |
| Darren Twedell; Renee Edge; David | ) | |
| Purdy; Bill Poland; Xio Sosa; Ginny | ) | |
| McClure; Jim Keeler; Harris | ) | |
| Chisholm; Susan Webb; Joseph | ) | |
| Cessna; Travis Combs; John Brescia; | ) | |
| Natasha Pendergrass; Ashley Gates; | ) | |
| Paul Anderson; Kevin Elliot; John | ) | |
| Robinson; Matt Lesniak; John Does | ) | |
| 1-80; and Jane Does 1-50; | ) | |
| | ) | |
| Defendants. | ) | |

Three motions to dismiss are before the Court in this case. *See* ECF Nos. 20, 21, & 22.

Defendants CVS Health Corporation,[1] South Carolina CVS Pharmacy, LLC, and CVS Pharmacy,

Inc. (collectively, "the Corporate Defendants") filed a motion to dismiss for lack of personal

jurisdiction as to CVS Health Corporation and for failure to state a claim as to all three defendants,

pursuant to Rule 12(b)(2) and Rule 12(b)(6) of the Federal Rules of Civil Procedure.  ECF No. 20.

Defendants John Brescia, Joseph Cessna, Harris Chisholm, Travis Combs, Ashley Gates, Jim

---

[1]    Defendant CVS Health Corporation is improperly identified in the amended complaint as CVS Caremark Corporation.  *See* ECF No. 20 at 1.  Plaintiff's counsel agreed at the hearing to substitute CVS Health Corporation for CVS Caremark Corporation.  *See* Transcript (ECF No. 46) at 5.

Keeler, Ginny McClure, Ida Pendergrass,[2] Bill Poland, Xiomata Sosa,[3] Susan Webb, John Doe #1, Jane Doe #1, and Jane Doe #2 (collectively, "the Store-Level Defendants") filed a motion to dismiss for failure to state a claim, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. ECF No. 21. Defendants Paul Anderson, Mark Cosby, Shelly Edge,[4] Ronald Elliot,[5] Matt Lesniak, David Purdy, John Robinson, and Darren Twedell (collectively, "the Above-Store Defendants") filed a motion to dismiss for lack of personal jurisdiction as to Mark Cosby and for failure to state a claim as to all eight defendants, pursuant to Rule 12(b)(2) and 12(b)(6) of the Federal Rules of Civil Procedure. ECF No. 22. The Court held a hearing on the motions on September 10, 2015. *See* ECF Nos. 45 & 46.

For the reasons set forth below, the Court grants in part and denies in part the motions to dismiss.

## **Background**

Plaintiff filed his initial complaint on August 28, 2014, and an amended complaint on September 17, 2014. *See* ECF Nos. 1 & 9. Plaintiff's amended complaint asserted the following claims: violation of the Americans with Disabilities Act, 42 U.S.C. § 12101, *et seq.*; civil rights violations under 42 U.S.C. §§ 1981, 1985, 1986, and 2000d, *et seq.*; violation of Section 1557 of the Patient Protection and Affordable Care Act, 42 U.S.C. § 18116; and various state common law torts.

---

[2]     Defendant Ida Pendergrass is improperly identified in the amended complaint as Natasha Pendergrass. *See* ECF No. 21 at 1.

[3]     Defendant Xiomata Sosa is improperly identified in the amended complaint as Xio Sosa. *See* ECF No. 21 at 1.

[4]     Defendant Shelly Edge is improperly identified in the amended complaint as Renee Edge. *See* ECF No. 22 at 1.

[5]     Defendant Ronald Elliot is improperly identified in the amended complaint as Kevin Elliot. *See* ECF No. 22 at 1.

*See* Amended Complaint, ECF No. 9.  Plaintiff also sought declaratory and injunctive relief.  *See id.*
On November 13, 2014, the Corporate Defendants, Store-Level Defendants, and Above-Store
Defendants filed motions to dismiss, arguing Plaintiff's amended complaint failed to state claims
upon which relief could be granted and that the Court lacked personal jurisdiction over two of the
defendants, CVS Health Corporation and Mark Cosby.  *See* ECF Nos. 20, 21, & 22.  The facts, as
alleged in Plaintiff's amended complaint, are as follows.

I.      **Plaintiff's Military Service and Related Disabilities**

Plaintiff, an African-American male, joined the United States Marine Corps in 2001 after the
events of September 11.  Amended Complaint at 2; *id.* at ¶ 45.  In 2002, he was diagnosed with
Post-Traumatic Stress Disorder (PTSD), and the Marine Corps discharged him with a service-
related disability.  *Id.* at ¶ 47.  Plaintiff's PTSD symptoms include extreme agoraphobia, for which
he wears a sports towel draped over his head as a psychological coping mechanism.  *Id.* at ¶ 47-48.
When Plaintiff encounters multiple unknown persons, he experiences anxiety and panic attacks.  *Id.*
at ¶ 55.  By 2010, circumstances required Plaintiff to accept Veterans Administration benefits for
service-connected disabilities.  *Id.* at ¶ 49.  He also was diagnosed with major depression, severe
anxiety, and suicidal ideation.  *Id.* at ¶ 50.

Plaintiff's medical doctors chose a course of treatment for Plaintiff's conditions that would
allow him to "gradually regain his place in society" and "reacquaint him with social interaction
and/or improve his social skills."  *Id.* at ¶¶ 52-53.  Doctors believed places of public
accommodation would allow Plaintiff to enter the establishment during non-business hours so that
he could avoid other customers.  *Id.*  Doctors chose this course of treatment so that Plaintiff would
be able to request modest accommodations under the Americans with Disabilities Act.  *Id.*

## II.    Initial Requests for Accommodation

In or around February 2012, based on his Veterans Administration diagnosis of PTSD with accompanying extreme agoraphobia, Plaintiff requested reasonable accommodation from the South Carolina Department of Motor Vehicles (SCDMV) so that he could renew his driver's license. *Id.* at ¶ 56.  The SCDMV accommodated Plaintiff and allowed him to renew his driver's license during non-business hours at an office located in Kingstree, South Carolina. *Id.* at ¶ 57.

Based on the SCDMV's "warm" response to his request for accommodation, Plaintiff and his doctors agreed Plaintiff should request similar accommodations from a "grocery store, clothing store, hardware store, or other sales or rental establishment." *Id.* at ¶ 59.  Sometime between August and September 2013, Plaintiff requested permission to shop after hours at a Best Buy electronics store located in North Charleston, South Carolina. *Id.* at ¶¶ 60-61.  Best Buy permitted Plaintiff to shop after hours, asking that he provide an advance notice of one day to ensure store personnel would be available to fulfill his requested accommodation. *Id.* at ¶ 61.

Besides the SCDMV and Best Buy, Plaintiff requested and received accommodations from grocery stores and pharmacies located in other parts of South Carolina, including Columbia, Myrtle Beach, Charleston, Summerville, and North Charleston. *Id.* at ¶ 62.  Those retail establishments included Publix Food and Pharmacy, Food Lion, Delta Pharmacy, Costco, Sam's Club, and Family Dollar. *Id.*

## III.    Requests for Accommodation at CVS Stores

On or around August 27, 2013, Plaintiff contacted CVS Store #7159, spoke with store manager Defendant Bill Poland, explained to Poland the nature of his disability and need for reasonable accommodation, and requested permission to shop after hours. *Id.* at ¶ 65.  Plaintiff

4

asked if CVS would lock the door at closing time to prevent other customers from entering the store while he was shopping.  *Id*.  He also asked if store employees could divert other customers to a portion of the store so that he could "exit and escape the situation of being around too many customers."  *Id*.  Citing store policy, Poland denied Plaintiff's requests.  *Id*.

The next day, August 28, Plaintiff again contacted CVS Store #7159, spoke to Defendant John Doe #1, and explained his PTSD diagnosis and related agoraphobia symptoms.  *Id*. at ¶ 66.  John Doe #1 "giggled" and asserted store policy prohibited customers from shopping after hours and required all employees to exit the store at closing.  *Id*.  Plaintiff later obtained video evidence showing customers shopping after hours and managers present in various CVS stores for over twenty minutes after closing time.  *Id*.

Also on August 28, Plaintiff contacted CVS Store #7568 in Goose Creek, South Carolina, spoke with store manager Defendant Travis Combs, explained the nature of his PTSD-related disability, and requested permission to shop and fill his prescriptions after hours.  *Id*. at ¶ 67.  Combs denied Plaintiff's request, citing company policy, loss prevention, and safety concerns.  *Id*.

On August 29, 2013, Plaintiff submitted a complaint to CVS Customer Care via a 1-800 telephone number and spoke to a representative named Abby.  *Id*. at 68.  Plaintiff explained his disability to Abby and asked her if CVS policy permitted him to shop for approximately ten minutes after the store closed and after the front doors are locked so that other customers could not enter the store while he was shopping.  *Id*.  Abby informed Plaintiff that each store manager had the authority to grant his request and that he needed to contact the managers individually to seek reasonable accommodation.  *Id*.

On September 4, 2013, Plaintiff contacted CVS Store #563, spoke to store manager

5

Defendant Ginny McClure, explained his disability, and requested permission to shop after hours. *Id.* at ¶ 70. McClure refused the request for accommodation. *Id.* The same day, Plaintiff contacted CVS Store #7305 and spoke to store manager Defendant Ashley Gates. *Id.* at ¶ 71. He informed Gates of his disability, stated he would like to shop in the CVS, and explained he needed prescriptions filled. *Id.* Defendant Gates denied Plaintiff's request for accommodation, citing "'safety reasons'" as the basis for denial. *Id.*

Also on September 4, Plaintiff contacted CVS Store #563 for a second time and spoke with Defendant Xio Sosa, who identified herself as the manager. *Id.* at ¶ 72. He explained his disability and requested accommodation, which Sosa refused. *Id.* Sosa asserted she could not help Plaintiff and that she would not be paid "'to stay here after 10 o'clock.'" *Id.* Defendant Sosa asked Plaintiff, "'[A]re you the same black guy that contacted us before?'" *Id.* After Plaintiff answered in the affirmative, Defendant Sosa stated, "'I don't trust you and your request seems suspicious.'" *Id.*

On September 5, 2013, Plaintiff and an acquaintance went to CVS Store #7697 to request accommodations.[6] *Id.* at ¶ 73. Plaintiff and his acquaintance met with Defendant Jane Doe #1, a shift supervisor, and the acquaintance explained to Jane Doe #1 the nature of Plaintiff's disability and need for accommodation. *Id.* Jane Doe #1 stated she could not accommodate Plaintiff due to CVS policies. *Id.* Plaintiff and his acquaintance later spoke with the store manager, Defendant Susan Webb, who informed Plaintiff that no CVS would accommodate his request. *Id.*

The same day, Plaintiff contacted CVS Store #8492 and spoke with Defendant Joe Cessna,

---

[6]    Plaintiff indicates all previous contact with CVS personnel had occurred via telephone communication. *See* Amended Complaint at ¶ 73 ("[Plaintiff] thought that there may be some type of misunderstanding on the part of CVS personnel when he made requests via telephone rather than in person and so, on or around September 5, 2013, [Plaintiff], accompanied by an acquaintance, went to CVS/pharmacy #7697.").

who identified himself as the manager. *Id*. at ¶ 74. Plaintiff explained his disability to Cessna and requested a reasonable accommodation, but Cessna stated the alarm activates when the door closes and locks, so he could not allow Plaintiff to shop after hours. *Id*. Plaintiff informed Cessna that, as manager, he had the authority to accommodate Plaintiff and that other, non-CVS stores had provided Plaintiff the requested accommodation: to shop after store hours. *Id*. Cessna replied, "'Why do so many blacks think they are entitled to special treatment so often?'" and informed Plaintiff that he could not help him. *Id*.

Also on September 5, Plaintiff contacted CVS Store #7386 and spoke to Defendant Jim Keeler, who identified himself as the manager. *Id*. at ¶ 75. Plaintiff explained his disability and requested accommodations for it. *Id*. Keeler laughed and made the following statements: (1) "'I am not allowed to break CVS policies because of your PTSD, regardless if you're a Marine or not, and our whole district and other districts know some black guy wearing a towel was trying to get a special accommodation but none of them are going to help you'"; and (2) "'[Y]ou should choose a different chain store.'" *Id*. Plaintiff informed Keeler that CVS allows managers to grant Plaintiff's request "because it's the law" and because "CVS store personnel are supposed to comply with the law and help people like [Plaintiff]." *Id*. Keeler became agitated, talking in a loud and aggressive tone, and admitted the existence of a conspiracy—within Keeler's district and other districts—to discriminate against Plaintiff. *Id*. Defendant Keeler used a racial slur to refer to Plaintiff and threatened to call the police. *Id*.

After his experience with Defendants Cessna and Keeler, and after consulting with his doctors, Plaintiff decided to request accommodations only from CVS managers who had stores located outside the greater Myrtle Beach area and who were either females or non-white males. *Id*.

7

at ¶ 76.

Between mid-September to mid-October 2013, Plaintiff contacted CVS Store #4399 and spoke to Defendant Jane Doe #2, who identified herself as the store manager. *Id*. at 77. Plaintiff explained his disability and requested an accommodation. *Id*. Jane Doe #2 explained that "'because of the area the store is in, I won't accommodate you,'" and she cited CVS policies prohibiting any customer from remaining in the store past closing time. *Id*. Plaintiff contacted CVS Store #4114 and spoke with Defendant Harris Chisholm, who identified himself as the store manager. *Id*. at ¶ 78. Plaintiff explained his disability to Chisholm and requested an accommodation to shop after closing time, but Chisholm denied Plaintiff's request, citing safety reasons. *Id*.

Plaintiff then attempted to obtain reasonable accommodation by making a request in person. *Id*. at ¶ 79. He drove to CVS Store #3199 in Columbia, South Carolina, and while outside the CVS, asked a passerby if they would ask the manager to exit the store and meet with him outside. *Id*. The manager, Defendant Natasha Pendergrass, came outside, met with Plaintiff beside his vehicle, and identified herself. *Id*. Plaintiff explained his disability, offered medical documents as proof, and asked Pendergrass if the location would allow him to shop after hours for approximately ten minutes. *Id*. at ¶ 80. Pendergrass denied Plaintiff's request, citing CVS policy. *Id*. Plaintiff informed Pendergrass that she had the authority to accommodate his request because she was the store manager. *Id*. Pendergrass responded that while she may have the authority, she did not feel comfortable or safe allowing Plaintiff to shop after hours with the doors locked while he was wearing a sports towel draped over his head. *Id*. Plaintiff explained what living with his disability was like and expressed frustration with the fact that nobody at CVS was willing to help him. *Id*.

Pendergrass began questioning Plaintiff about his disability and the sports towel that he was

8

wearing on his head.  *Id*. at ¶ 81.  She reached for the towel, saying, "'What's up with the towel?

It's kinda scaring me.'"  *Id*.  She attempted to remove the towel from Plaintiff's head, commented

on his physique, said "'toughen up, boy, you have all those big muscles,'" and shook him by the

shoulder.  *Id*. at ¶ 81-82.  Pendergrass called over a group of four or more people who were

approaching the CVS store.  *Id*. at ¶ 82.  Plaintiff begged her to stop, explaining he may suffer an

anxiety attack or worse and was embarrassed by his reactions to crowds.  *Id*.  Pendergrass remarked,

"'Listen here, boy, you need to toughen up.  Why are you so nervous?'"  *Id*.  Plaintiff told her, "'I

don't think your boss would like what you're doing.'"  *Id*.  She replied, "'Well, our district manager

already knows about your contact with other stores and we already discussed what I was going to do

if you came to my store.'"  *Id*.

 Despite Plaintiff's continued pleas, Pendergrass requested that the group of people gather

around his car.  *Id*.  Plaintiff tried to enter his car and leave, but Pendergrass stood on the inside of

the driver's side door, preventing him from closing the door and leaving.  *Id*.  Plaintiff began to

suffer a severe panic attack.  *Id*.  Pendergrass disclosed Plaintiff's medical condition to the group of

people gathered around the car and explained why she had called them over.  *Id*.  After some time, a

person in the group suggested they leave Plaintiff alone because "'he appears to be pretty shaken

up.'"  *Id*.  After Pendergrass stepped away from the vehicle, Plaintiff was able to close the car door

and leave.  *Id*.

 After the incident with Pendergrass, Plaintiff lodged a complaint with CVS Customer

Relations via a 1-800 telephone number.  *Id*. at ¶ 83.  Plaintiff spoke to a customer relations

representative and described how CVS personnel had treated him.  *Id*.  The representative

apologized and offered Plaintiff a $25 gift card.  *Id*.  Plaintiff told the representative that the gift

card was an insult, so the representative said a "'team'" of people would review Plaintiff's complaint and contact him soon; as of the filing date of the amended complaint, Plaintiff had received no contact. *Id*.

Since the incident with Pendergrass, Plaintiff has experienced a multitude of feelings including humility, anger, and endured traumatic stress manifesting in flashbacks. *Id*. at ¶ 85. Plaintiff has also experienced tension headaches, insomnia, panic attack, nervousness, nausea, and dizziness, and has been prescribed multiple medications. *Id*.

A white female friend of Plaintiff's was outraged by CVS's treatment of him, so she decided to help him test the veracity of CVS's purported inability to make reasonable accommodations. *Id*. at ¶ 86. On October 16, 2013, the friend called CVS Store #7305 and spoke to the store manager, Defendant Gates. *Id*. at ¶ 87. The friend told Gates she had been diagnosed with agoraphobia and had anxiety issues, and she asked to shop for approximately fifteen minutes after closing time. *Id*. Gates permitted Plaintiff's white female friend to enter the store after it was closed and locked. *Id*.

On October 17, 2013, the white female friend called CVS Store #3199 and spoke to Pendergrass. *Id*. at ¶ 88. She informed Pendergrass that she had a severe case of anxiety and agoraphobia. *Id*. The friend requested permission to shop for ten to thirty minutes after hours. *Id*. Defendant Pendergrass stated, "'Yes, you sound like a sweet girl so, yes, that's not a problem; we will gladly accommodate you. Just call before you come so that I could inform other staff members, and be here right at closing time.'" *Id*. Additionally, Plaintiff's white female friend called CVS Store #563 and spoke with Sosa, and also called Store #7386 and spoke with Keeler; she requested permission from Sosa and Keeler to shop after hours with the doors locked to prevent other customers from entering the store. *Id*. at ¶¶ 89-90. Sosa and Keeler both stated they would

10

accommodate her. *Id.*

On or about April 9, 2014, Plaintiff sent a letter to CVS General Counsel, Thomas Moriarty, and Poland (manager of CVS Store #7159) in which he discussed his requests for accommodation and repeated denials of accommodation by CVS personnel. *Id.* at ¶ 91. Defendant John Robinson responded to Plaintiff's letter. *Id.* at ¶ 92. In his written response, Defendant Robinson identified himself as a district manager and stated Plaintiff's request that the store remain open so that he could shop without other customers present was "'not a necessary or reasonable accommodation, would impose an undue hardship on employees, and is a fundamental alteration of the goods and services CVS provides.'" *Id.*

On or about May 19, 2014, a gray truck flashing its headlights pursued Plaintiff while he was driving near his home. *Id.* at ¶ 95. Thinking something was wrong with his vehicle, Plaintiff pulled to the side of the road. *Id.* The truck parked behind Plaintiff's car. *Id.* A white male driver exited the truck and began threatening Plaintiff about the complaints Plaintiff had lodged with CVS. *Id.* The driver warned, "'I promise you will get hurt if you file a lawsuit.'" *Id.* Plaintiff filed a police report after the incident but was unable to identify the driver. *Id.* at ¶ 96.

Finally, Plaintiff alleges the Above-Store Defendants—President Mark Cosby, Vice President David Purdy, Regional Managers Darren Twedell and Shelly Edge, and District Managers Robinson, Paul Anderson, Ronald Elliot, and Matt Lesniak—cultivated a climate of hostility and discrimination directed against a disabled African-American male seeking reasonable accommodation. *Id.* at ¶ 98.

## IV.    Plaintiff's Causes of Action

Plaintiff asserts the following causes of action: (1) discrimination and failure to

11

accommodate in violation of the Americans with Disabilities Act of 1990, 42 U.S.C. § 12101, *et seq.*, as to all Defendants; (2) racial discrimination in violation of 42 U.S.C. § 1981, as to all Defendants; (3) conspiracy to interfere with civil rights in violation of 42 U.S.C. § 1985(3), as to all Defendants; (4) failure to prevent deprivation of rights in violation of 42 U.S.C. § 1986, as to all Defendants; (5) discrimination in a program or activity that receives federal financial assistance in violation of Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d, *et seq.*, as to the Corporate Defendants; (6) discrimination based on race, gender, and disability in violation of Section 1557 of the Patient Protection and Affordable Care Act, 42 U.S.C. § 18116, as to the Corporate Defendants; (7) assault as to the Corporate Defendants, Defendant Pendergrass, and one or more John and Jane Doe defendants; (8) battery as to the Corporate Defendants, Defendant Pendergrass, and one or more John and Jane Doe defendants; (9) false imprisonment as to the Corporate Defendants, Defendant Pendergrass, and one or more John and Jane Doe defendants; (10) intentional infliction of emotional distress as to the Corporate Defendants, Pendergrass, Keeler, and at least some of the John and Jane Doe defendants; (11) civil conspiracy as to all Defendants; (12) negligence as to all Defendants; (13) negligent supervision and/or retention as to all Defendants; (14) intentional interference with contract and/or intentional interference with prospective contractual relations as to all Defendants; (15) unfair trade practices as to the Corporate Defendants; (16) request for declaratory relief as to all Defendants; and (17) request for injunctive relief as to all Defendants.[7] *See* Amended Complaint at 49-101.

## Standards of Review

---

[7]    Although Plaintiff's complaint lumps together all defendants in many of the causes of action (usually referring to them as "the Defendants"), Plaintiff conceded—in his responses to the motions to dismiss and at the hearing in this matter—that not all defendants are being sued for every cause of action.  The Court references Plaintiff's concessions where applicable in this order.

## I.    Motions to Dismiss for Lack of Personal Jurisdiction

When a defendant challenges a court's personal jurisdiction pursuant to Federal Rule of

Civil Procedure 12(b)(2), the plaintiff has "the burden of proving" jurisdiction exists "by a

preponderance of the evidence." *In re Celotex Corp.*, 124 F.3d 619, 628 (4th Cir. 1997).  "[W]hen,

as here, a district court rules on a Rule 12(b)(2) motion without conducting an evidentiary hearing or

without deferring ruling pending receipt at trial of evidence relevant to the jurisdictional issue, but

rather relies on the complaint and affidavits alone, the burden on the plaintiff is simply to make a

prima facie showing of sufficient jurisdictional basis in order to survive the jurisdictional

challenge."[8] *Id.* (internal quotation marks omitted); *see also New Wellington Fin. Corp. v. Flagship

Resort Dev. Corp.*, 416 F.3d 290, 294 (4th Cir. 2005) (noting a plaintiff need only make a prima

facie showing of jurisdiction when the court does not conduct an evidentiary hearing).  In deciding

whether the plaintiff has met this burden, the court must construe all disputed facts and draw all

reasonable inferences in favor of jurisdiction.  *Carefirst of Maryland, Inc. v. Carefirst Pregnancy

Centers, Inc.*, 334 F.3d 390, 396 (4th Cir. 2003); *Mylan Labs., Inc. v. Akzo, N.V.*, 2 F.3d 56, 60 (4th

Cir. 1993).  In ruling on a motion to dismiss for lack of personal jurisdiction, the court may consider

evidence outside of the pleadings, such as affidavits and other evidentiary materials, without

converting the motion to one for summary judgment.  *Magic Toyota, Inc. v. Se. Toyota Distributors,

Inc.*, 784 F. Supp. 306, 310 (D.S.C. 1992).

## II.    Motions to Dismiss for Failure to State a Claim

When deciding a motion to dismiss made under Federal Rule of Civil Procedure 12(b)(6),

---

[8]    Plaintiff's counsel stated at the hearing that he does not seek jurisdictional discovery at this time.  Transcript at 8.

the Court must accept all well-pled facts alleged in the complaint as true and draw all reasonable inferences in the plaintiff's favor. *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 253 (4th Cir. 2009). A complaint must state a "'plausible claim for relief'" to survive a 12(b)(6) motion to dismiss. *Walters v. McMahen*, 684 F.3d 435, 439 (4th Cir. 2012) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009)). The Court will not dismiss the plaintiff's complaint so long as he provides adequate detail about his claims to show he has a "more-than-conceivable chance of success on the merits." *Owens v. Baltimore City State's Attorneys Office*, 767 F.3d 379, 396 (4th Cir. 2014) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2006)). "Once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint." *Twombly*, 550 U.S. at 563. A complaint will survive a motion to dismiss if it contains "enough facts to state a claim to relief that is plausible on its face." *Id.* at 570. However, when a plaintiff's assertions "amount to nothing more than a 'formulaic recitation of the elements'" of a cause of action, the Court may deem such allegations conclusory and not entitled to an assumption of veracity. *Iqbal*, 556 U.S. at 681 (quoting *Twombly*, 550 U.S. at 555).

## Discussion

**I.    Personal Jurisdiction Over CVS Health Corporation and Mark Cosby**

Defendants CVS Health Corporation and Mark Cosby move to dismiss Plaintiff's claims on the basis that the Court lacks personal jurisdiction over them. *See* ECF Nos. 20 & 22. They argue they do not have sufficient minimum contacts with South Carolina and contend maintenance of the suit here would offend traditional notions of fair play and substantial justice. ECF No. 20-1 at 3-6; ECF No. 22-2 at 4-8. They assert Plaintiff cannot carry his burden to establish specific or general personal jurisdiction. *Id.*

14

### A.    Applicable Law

Two conditions must be satisfied for a plaintiff to assert personal jurisdiction over a defendant. *Christian Sci. Bd. of Directors of First Church of Christ, Scientist v. Nolan*, 259 F.3d 209, 215 (4th Cir. 2001). "First, the exercise of jurisdiction must be authorized by the long-arm statute of the forum state, and, second, the exercise of personal jurisdiction must also comport with Fourteenth Amendment due process requirements." *Id.* South Carolina's long-arm statute has been construed to be coextensive with, and reach the outer limits allowed by, the Due Process Clause. *ESAB Grp., Inc. v. Zurich Ins. PLC*, 685 F.3d 376, 391 (4th Cir. 2012) (citing *Cockrell v. Hillerich & Bradsby Co.*, 363 S.C. 485, 491, 611 S.E.2d 505, 508 (2005) (construing S.C. Code Ann. § 36-2-803 (2003))). Therefore, "the statutory inquiry necessarily merges with the constitutional inquiry, and the two inquiries essentially become one." *Stover v. O'Connell Assocs., Inc.*, 84 F.3d 132, 135-36 (4th Cir. 1996). Accordingly, the scope of the inquiry is whether a defendant has "certain minimum contacts" with the forum "such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945) (internal quotation marks omitted). The analytical framework for determining whether minimum contacts exist differs according to which type of personal jurisdiction—general or specific—is alleged. *See generally ESAB Grp., Inc. v. Centricut, Inc.*, 126 F.3d 617, 623-24 (4th Cir. 1997).

If the defendant's contacts with the forum state provide the basis for the suit, those contacts may establish specific jurisdiction. *Carefirst of Md., Inc. v. Carefirst Pregnancy Ctrs., Inc.*, 334 F.3d 390, 397 (4th Cir. 2003). Under the Fourth Circuit's three-prong test for specific jurisdiction, a court must consider "(1) the extent to which the defendant purposefully availed itself of the privilege of conducting activities in the State; (2) whether the plaintiff['s] claims arise out of those

15

activities directed at the State; and (3) whether the exercise of personal jurisdiction would be constitutionally reasonable." *Consulting Eng'rs Corp. v. Geometric Ltd.*, 561 F.3d 273, 278 (4th Cir. 2009). South Carolina courts may exercise specific jurisdiction over a defendant pursuant to the state long-arm statute, depending upon the defendant's contacts with South Carolina. *Cribb v. Spatholt*, 382 S.C. 490, 498, 676 S.E.2d 714, 718 (Ct. App. 2009). Because the South Carolina long-arm statute is coextensive with the Due Process Clause, the sole question on a motion to dismiss for lack of personal jurisdiction is whether the exercise of personal jurisdiction would violate due process. *Tuttle Dozer Works, Inc. v. Gyro-Trac (USA), Inc.*, 463 F. Supp. 2d 544, 547 (D.S.C. 2006); *see also Cockrell*, 363 S.C. at 491, 611 S.E.2d at 508 ("Because South Carolina treats its long-arm statute as coextensive with the due process clause, the sole question becomes whether the exercise of personal jurisdiction would violate due process.").

When the defendant's contacts with the forum state do not form the basis for the suit, personal jurisdiction over the defendant must arise from the defendant's general, more persistent, but unrelated contacts with the state—known as general jurisdiction. *ALS Scan, Inc. v. Digital Serv. Consultants, Inc.*, 293 F.3d 707, 712 (4th Cir. 2002). For general jurisdiction to exist, the defendant's activities in the state must have been "continuous and systematic." *Id.* The threshold level of minimum contacts required for general jurisdiction is significantly higher than the level needed for specific jurisdiction. *Id.* "[T]he defendant must be engaged in longstanding business in the forum state, such as marketing or shipping products, or performing services or maintaining one or more offices there; activities that are less extensive than that will not qualify for general in personam jurisdiction." 4 Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1067.5 (3d ed. 2002). "For an individual, the paradigm forum for the exercise of

16

general jurisdiction is the individual's domicile; for a corporation, it is an equivalent place, one in which the corporation is fairly regarded as at home." *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 131 S. Ct. 2846, 2853-54 (2011).[9]

The party seeking to invoke personal jurisdiction over a nonresident defendant bears the burden of proving the existence of personal jurisdiction. *ESAB Grp., Inc. v. Centricut, LLC*, 34 F. Supp. 2d 323, 328 (D.S.C. 1999). At the pretrial stage, the burden of proving personal jurisdiction over a nonresident is met by a prima facie showing of jurisdiction either in the complaint or in affidavits. *Id.* In determining whether a prima facie showing has been made, the court may consider the uncontroverted allegations in the plaintiff's complaint. *Wolf v. Richmond Cnty. Hosp. Auth.*, 745 F.2d 904, 908 (4th Cir. 1984). However, whenever a defendant's sworn affidavit contests the allegations in the complaint, the plaintiff can no longer rest on those allegations. *See id.* Instead, the plaintiff bears the burden to present an affidavit or other evidence showing jurisdiction exists over the nonresident defendant. *See id.*; *Clark v. Remark*, 993 F.2d 228, 1993 WL 134616, at *2 (4th Cir. 1993) (unpublished table decision).

**B.    Analysis**

For the reasons stated below, the Court finds it lacks personal jurisdiction over Defendants

---

[9]    In *Goodyear*, the Supreme Court addressed the question of whether a foreign subsidiary of a United States parent corporation was amenable to suit in North Carolina on claims unrelated to any activity of the subsidiaries in the forum state. *Id.* at 2850. The Court answered in the negative, unanimously holding that because Goodyear's foreign subsidiaries were "in no sense at home in North Carolina," those foreign subsidiaries could not be required to submit to the general jurisdiction of North Carolina courts. *Id.* at 2857.

More recently, the Supreme Court addressed general jurisdiction in *Daimler AG v. Bauman*, 134 S. Ct. 746, 750 (2014). The *Daimler* Court rejected the notion that a foreign corporation could be subjected to general jurisdiction whenever the foreign corporation has an in-state subsidiary or affiliate. *Id.* at 759-60. The Supreme Court also declined to adopt a per se rule that a corporation may be subject to general jurisdiction *only* in a forum where it is incorporated or has its principal place of business. *Id*. at 760. Instead, the *Daimler* Court held the relevant inquiry is whether the foreign "corporation's affiliations with the State are so continuous and systematic as to render [it] essentially at home in the forum State." *Id*. at 761 (alteration in original) (internal quotation marks omitted).

CVS Health Corporation and Mark Cosby.

### 1.    CVS Health Corporation

In support of its motion to dismiss, Defendant CVS Health Corporation (also referred to as "CVS Health") submitted an affidavit from Thomas S. Moffatt, who is the vice president, corporate secretary, and assistant general counsel of the corporate services division of CVS Pharmacy, Inc. *See* ECF No. 20-2.  Moffatt states in his affidavit that he is familiar with the corporate structure of CVS Health Corporation, its wholly-owned subsidiary, Defendant CVS Pharmacy, Inc., and Defendant South Carolina CVS Pharmacy, LLC, a South Carolina limited liability company and subsidiary of CVS Pharmacy, Inc., that directly owns and operates the stores located in South Carolina.  *Id.* at 2-3.  Moffatt claims CVS Health Corporation (1) is a holding company that has the primary functions of issuing stock traded on the New York Stock Exchange and filing reports with the Securities and Exchange Commission; (2) is organized under the laws of the State of Delaware and has its principal place of business in Rhode Island; (3) neither qualifies as a foreign corporation under South Carolina law nor has a registered agent for service of process in South Carolina; and (4) has no direct involvement in directing, managing, or supervising the operations or the employees of any of its subsidiary companies.  *Id.* at 3.

Plaintiff contends the Court has personal jurisdiction over CVS Health Corporation pursuant to the South Carolina long-arm statute.[10]  ECF No. 39 at 4.  He argues the long-arm statute applies

---

[10]    The South Carolina long-arm statute is codified at section 36-2-803 of the South Carolina Code (Supp. 2014) and provides:

> (A) A court may exercise personal jurisdiction over a person who acts directly or by an agent as to a cause of action arising from the person's:
>
> > (1) transacting any business in this State;
> > (2) contracting to supply services or things in the State;
> > (3) commission of a tortious act in whole or in part in this State;

because CVS Health transacts business in South Carolina, has an interest in real property in this state, contracts to insure people and property located within this state, and derives substantial revenue from goods used or consumed or services rendered in this state. *Id.* Specifically, Plaintiff claims CVS Health's (a) guaranty of certain leases on property in South Carolina and (b) payment of settlement proceeds to the State of South Carolina qualify as sufficient minimum contacts with this state. *Id.* at 4-6. Plaintiff also argues CVS Health is not merely a holding company because it entered into a corporate integrity agreement in which it agreed to monitor day-to-day compliance activities engaged in by CVS. *Id.* at 6. Plaintiff submitted various exhibits in support of these arguments. *See* ECF Nos. 39-1 to 39-17.

The Court finds it has neither specific nor general personal jurisdiction over CVS Health Corporation. Regarding specific jurisdiction, the Court must consider (1) the extent to which CVS Health purposefully availed itself of the privilege of conducting activities in South Carolina; (2) whether Plaintiff's claims arose out of those activities; and (3) whether the exercise of personal jurisdiction would be constitutionally reasonable. *See Consulting Eng'rs Corp.*, 561 F.3d at 279. Because CVS Health's contacts with South Carolina are sporadic and Plaintiff's claims do not arise

---

(4) causing tortious injury or death in this State by an act or omission outside this State if he regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered in this State;

(5) having an interest in, using, or possessing real property in this State;

(6) contracting to insure any person, property, or risk located within this State at the time of contracting;

(7) entry into a contract to be performed in whole or in part by either party in this State; or

(8) production, manufacture, or distribution of goods with the reasonable expectation that those goods are to be used or consumed in this State and are so used and consumed.

(B) When jurisdiction over a person is based solely upon this section, only a cause of action arising from acts enumerated in this section may be asserted against him.

from CVS Health's contacts with this state, the Court does not have specific personal jurisdiction over CVS Health. Although Plaintiff maintains the activities purportedly supporting personal jurisdiction include the guaranty of a lease on property located in South Carolina and the payment of a settlement to the State of South Carolina, the Court notes both activities are sporadic by their very nature and do not amount to purposeful availment of the privilege of conducting activities within South Carolina. Moreover, Plaintiff's causes of action have no relationship to CVS Health's sporadic contact, and he has failed to rebut Moffatt's affidavit with sufficient evidence. Accordingly, the Court declines to exercise specific personal jurisdiction over CVS Health.

Although Plaintiff does not argue the Court has general personal jurisdiction over CVS Health, the Court has conducted the appropriate inquiry and finds no such jurisdiction exists. Moffatt's affidavit establishes CVS Health is a holding company incorporated in Delaware with its principal place of business in Rhode Island. Plaintiff has not offered sufficient evidence showing CVS Health has an enduring relationship with South Carolina, as indicated by contacts that are substantial, continuous and systematic, so as to render it essentially at home in this forum. *See Daimler AG*, 134 S. Ct. at 761. The Court therefore concludes it lacks general personal jurisdiction over CVS Health Corporation.

### 2.    Mark Cosby

In support of his motion to dismiss, Defendant Mark Cosby submitted an affidavit in which he states he (1) is currently a resident of Massachusetts; (2) was a resident of Massachusetts and had an office located in Rhode Island when he was president of CVS Pharmacy; (3) may have visited South Carolina for business purposes on rare and isolated instances but cannot specifically recall if or when he made any such visits; (4) has never resided in South Carolina and has never owned any

real estate here; and (5) has never had any contact with the Plaintiff and had never heard of him until being named a defendant in the lawsuit. ECF No. 22-3 at 2-3. Plaintiff does not rebut Cosby's affidavit with any affidavits or other admissible evidence. Instead, Plaintiff relies on his amended complaint and asserts he has alleged sufficient facts demonstrating Cosby is subject to the Court's jurisdiction. ECF No. 29-1 at 4-6. Plaintiff also contends the South Carolina Unfair Trade Practices Act[11] confers personal jurisdiction over Cosby. *Id.* at 5.

The Court finds Plaintiff has not met his burden of establishing personal jurisdiction over Cosby because Plaintiff has presented no evidence to rebut Cosby's sworn affidavit indicating the requisite minimum contacts do not exist. *See Wolf*, 745 F.2d at 908 (explaining that when a defendant's sworn affidavit contests the allegations in the complaint, the plaintiff can no longer rest on those allegations and must instead present an affidavit or other evidence showing personal jurisdiction is proper). Cosby's contact with South Carolina is remote at best and does not satisfy the minimum contacts standard, and Plaintiff's argument regarding the South Carolina Unfair Trade Practices Act is meritless. The exercise of personal jurisdiction over a defendant must comport with due process, and in the absence of minimum contacts with the South Carolina, a due process violation occurs. *Nolan*, 259 F.3d at 215. As to specific jurisdiction, Cosby's contact with South Carolina is virtually nonexistent, has no connection to the allegations in Plaintiff's amended complaint, and cannot reasonably be considered purposeful activity directed toward this state. *See Consulting Eng'rs Corp.*, 561 F.3d at 279. Plaintiff cannot establish general jurisdiction because Cosby lacks substantial contact with South Carolina so as to render him essentially at home here. Consequently, the Court cannot exercise either specific or general personal jurisdiction over Cosby.

---

[11]    S.C. Code Ann. §§ 39-5-10 to -560 (1985 & Supp. 2014).

For the foregoing reasons, the Court grants CVS Health Corporation's and Cosby's motions to dismiss for lack of personal jurisdiction and dismisses them from all causes of action in the amended complaint.[12]

## II.   Americans with Disabilities Act, 42 U.S.C. § 12182 (Denial of Public Accommodations)

Plaintiff asserts a claim against all defendants under 42 U.S.C. § 12182 of the Americans with Disabilities Act ("ADA") based on their alleged failure or refusal to allow him to shop after hours with the door locked to ensure that other customers would not enter the store while he was shopping.  Amended Complaint at ¶¶ 114-39.  Defendants argue Plaintiff's ADA claim should be dismissed because (1) Plaintiff has not alleged sufficient facts showing he suffers from a disability within the meaning of the ADA; (2) Plaintiff lacks standing under Article III of the United States Constitution because he was not actually denied the full and equal enjoyment of CVS's goods and services and therefore has not suffered an injury in fact; (3) even if Plaintiff had standing, no barrier obstructed his ability to access CVS's goods and services based on his alleged disability; (4) Plaintiff's request for segregated accommodation is inconsistent with the ADA; and (5) CVS provided Plaintiff with reasonable alternatives (to his request to shop after hours) that would have allowed him to shop at CVS stores.  ECF No. 20-1 at 7-12; ECF No. 21-1 at 3-4; ECF No. 22-1 at 2-4.  Defendants contend Plaintiff's complaint should be construed either (1) as a challenge to the *sufficiency* of the goods and services provided by CVS—not as a challenge alleging a *denial* of goods and services—or (2) as a complaint that CVS did not provide Plaintiff with his preferred accommodation; Defendants maintain neither claim is sufficient to state a claim under the ADA.

---

[12]      From this point onward, the Court's reference to the Corporate Defendants does not include CVS Health Corporation, and its reference to the Above-Store Defendants does not include Mark Cosby.

ECF No. 20-1 at 11-12.

## A.    The ADA

Congress enacted Title III of the ADA to facilitate disabled individuals' access to places of public accommodation. *Montalvo v. Radcliffe*, 167 F.3d 873, 876 (4th Cir. 1999); *see* 42 U.S.C. § 12101(a)-(b) (containing the congressional findings and purpose for the ADA). Consistent with this goal, the Act contains the following broad statement:

> No individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation.

42 U.S.C. § 12182(a). Title III defines discrimination to include "a failure to make reasonable modifications . . . unless the entity can demonstrate that making such modifications would fundamentally alter the nature of [the public accommodation]." 42 U.S.C. § 12182(b)(2)(A)(ii).

To state a claim under Title III, a plaintiff must allege (1) he is disabled within the meaning of the ADA; (2) the defendant is a private entity that owns, leases, or operates a place of public accommodation; and (3) the defendant denied the plaintiff public accommodations because of his disability. 42 U.S.C. §§ 12182(a)-(b); *see Arizona ex rel. Goddard v. Harkins Amusement Enterprises, Inc.*, 603 F.3d 666, 670 (9th Cir. 2010); *Camarillo v. Carrols Corp.*, 518 F.3d 153, 156 (2d Cir. 2008). To establish Article III standing, a plaintiff must demonstrate that he has suffered an injury in fact, that the injury is traceable to the defendant's challenged conduct, and that the injury can be redressed by a favorable decision. *Norkunas v. Park Rd. Shopping Ctr., Inc.*, 777 F. Supp. 2d 998, 1001 (W.D.N.C. 2011) (case involving the ADA), *aff'd*, 474 F. App'x 369 (4th Cir. 2012). Monetary damages are not available under Title III, but injunctive relief is available. *Gregory v.*

*Otac, Inc.*, 247 F. Supp. 2d 764, 770 (D. Md. 2003).  To have standing to obtain injunctive relief, a plaintiff must "demonstrate a likelihood that he will suffer future discrimination at the hands of the defendant."  *Id.*

Plaintiff alleges Defendants violated the following subsections of 42 U.S.C. § 12182: (1) § 12182(b)(1)(A)(i), by denying him the opportunity to participate in or benefit from the goods, services, facilities, privileges, advantages, or accommodations of an entity; (2) § 12182(b)(1)(A)(ii), by denying Plaintiff, on the basis of his disability, the opportunity to participate in or benefit from a good, service, facility, privilege, advantage, or accommodation equal to that afforded other individuals; (3) § 12182(b)(1)(A)(iii), by providing Plaintiff, on the basis of his disability, with a good, service, facility, privilege, advantage, or accommodation that is different or separate from that provided to other individuals; (4) § 12182(b)(1)(B), by not providing Plaintiff an accommodation in the most integrated setting appropriate for his needs; (5) § 12182(b)(1)(D), by utilizing standards, criteria, or methods of administration that have the effect of discriminating on the basis of disability or that perpetuate the discrimination of others who are subject to common administrative control; (6) § 12182(b)(1)(E), by denying goods, services, facilities, privileges, advantages, accommodations, or other opportunities to Plaintiff—with whom Defendants have a relationship or association—because of his known disability; (7) § 12182(b)(2)(A), by engaging in the specific prohibitions of § 12182 and other provisions of the ADA; and (8) § 12182(b)(2)(A)(iv)-(v), by failing to demonstrate the removal of any barrier is not readily achievable.  Amended Complaint at ¶¶ 128-135.

Having thoroughly reviewed the facts alleged in the complaint, the Court does not see how subsections 12182(b)(2)(A)(iv)-(v) (denial of access based on architectural barriers) apply to

24

Plaintiff's factual allegations. His allegations instead suggest a narrower claim based on

Defendants' alleged failure to provide a reasonable accommodation for Plaintiff—namely, not

allowing him to shop after hours with the door locked outside the presence of other customers—so

that he could enjoy CVS's goods and services without experiencing the anxiety and panic attacks

that occur when he confronts crowds of people. This aspect of Plaintiff's claim appears to fall under

§ 12182(b)(2)(A)(ii), which provides "discrimination includes . . . a failure to make reasonable

modifications in policies, practices, or procedures, when such modifications are necessary to afford

such goods, services, facilities, privileges, advantages, or accommodations to individuals with

disabilities, unless the entity can demonstrate that making such modifications would fundamentally

alter the nature of such goods, services, facilities, privileges, advantages, or accommodations." 42

U.S.C. § 12182(b)(2)(A)(ii).

"To recover under section 12182(b)(2)(A)(ii) in a retail sale case, a plaintiff must show that

he comes within the protections of the ADA as a person with a disability and that the defendant's

establishment is subject to the mandates of Title III as a place of public accommodation." *Dudley v.*

*Hannaford Bros. Co.*, 333 F.3d 299, 307 (1st Cir. 2003) (internal citation omitted). The plaintiff

must also show four additional requirements, including

> that the defendant has a discriminatory policy or practice in effect;
> that he (the plaintiff) requested a reasonable modification in that
> policy or practice which, if granted, would have afforded him
> access to the desired goods; that the requested modification—or a
> modification like it—was necessary to afford that access; and that
> the defendant nonetheless refused to modify the policy or practice.

*Id.* (citing *PGA Tour, Inc. v. Martin*, 532 U.S. 661, 683 n.38 (2001)). If the plaintiff makes this

six-part showing, the defendant must make the modification unless it proves either that doing so

would alter the fundamental nature of its business, *see PGA Tour*, 532 U.S. at 683 & 683 n.38, or

that the requested modification poses a direct threat to the health or safety of others, *Bragdon v. Abbott*, 524 U.S. 624, 648-49 (1998).  The ADA does not require a public entity to provide a disabled individual with the accommodation of his choice.  *McElwee v. Cnty. of Orange*, 700 F.3d 635, 641 (2d Cir. 2012).

Regarding Defendants' alleged failure to make reasonable accommodations so that Plaintiff could use CVS's goods and services, Plaintiff bears the burden of proving a modification was requested and is reasonable. *Johnson v. Gambrinus Company/Spoetzl Brewery*, 116 F.3d 1052, 1059 (5th Cir. 1997).  The plaintiff satisfies this burden if he introduces evidence showing the requested modification is reasonable in the general sense—"that is, reasonable in the run of cases."  *Id.* Although the defendant may introduce evidence showing the plaintiff's requested modification is not reasonable, the plaintiff has the ultimate burden of proof on the issue of reasonableness. *Id.*

### B.    Whether Individuals Can Be Sued Under Title III

Besides the five arguments summarized at the beginning of section (II) of this order, Defendants argue the Above-Store Defendants and Store-Level Defendants, who are individuals, are not proper defendants under Title III.  ECF No. 21-1 at 3-4; ECF No. 22-1 at 2.  Although the Fourth Circuit has not decided whether individuals may be sued under Title III, "[n]early every court that has decided the issue of individual liability under Title III has found that individuals can be held responsible for violations of these prohibitions against discrimination if they own, lease, or operate a place of public accommodation."  *Clement v. Satterfield*, 927 F. Supp. 2d 297, 313 (W.D. Va. 2013) (alteration in original).  "[T]he question of whether a person is a proper defendant under [Title III] turns not on whether the defendant is a person, partnership, corporation or other entity but, instead, whether the defendant owns, leases or *operates* a place of public accommodation

26

within the meaning of the ADA." *Id.* at 313-14 (alterations in original) (emphasis added). Thus, the relevant inquiry is whether the individual defendants operated the CVS stores that allegedly denied Plaintiff's request for reasonable accommodations under the ADA.

Under Title III, the term "operate" means "to put or keep in operation," "to control or direct the functioning of," or "to conduct the affairs of; manage." *Id.* at 314. "[C]ourts have focused on the issue of control in determining whether an individual defendant 'operated' a place of public accommodation." *Id.* Courts have interpreted the phrase "to operate" to mean "being in a position of authority and having the power and discretion to perform potentially discriminatory acts[,] where the discriminatory acts are the result of exercise of the individual's own discretion, and not merely the implementation of institutional policies or the mandates of superiors." *Id.* (internal quotation marks omitted); *see id.* at 314-15 (stating that in other words, operate "implies the performance of some sort of function, in conjunction with a degree of sanctioned authority"). An individual may be liable as an operator of a public accommodation if (1) he or she is in a position of authority; (2) within the scope of this authority, the individual has both the power and discretion to perform potentially discriminatory acts; and (3) the discriminatory acts result from individual exercising his or her own discretion, not from the implementation of institutional policy or a superior's mandate. *Id.* at 315.

### C.    The Court's Ruling

At this early stage of the proceedings, the Court finds Plaintiff has alleged facts sufficient to state a claim for discrimination under Title III that is plausible on its face against the remaining Corporate Defendants (South Carolina CVS Pharmacy, LLC and CVS Pharmacy, Inc.) and the Store-Level Defendants who denied Plaintiff's request for accommodations. Plaintiff has alleged

27

that he is disabled within the meaning of the ADA, that the remaining Corporate Defendants and the Store-Level Defendants own, lease, or operate a place of public accommodation, and that these defendants denied him public accommodations and access to CVS's goods and services because of his disability. Whether Plaintiff's requested modification was reasonable, and whether it was appropriate to the extent it required segregated accommodation, are issues more properly reserved for summary judgment, at which stage Plaintiff will bear the burden to prove reasonableness. *See Johnson*, 116 F.3d at 1059.

As to the Above-Store Defendants, however, Plaintiff's allegations do not indicate any of them had direct contact with him. Besides the sole reference to Defendant Robinson, who simply authored a letter explaining the reasons for CVS's refusal to accommodate Plaintiff's after-hours shopping request, Plaintiff has alleged no plausible facts creating a reasonable inference that the Above-Store Defendants engaged in any discriminatory conduct violating the ADA. Plaintiff's ADA claim against the Above-Store Defendants warrants dismissal under Rule 12(b)(6).

In light of the foregoing, the Court denies the remaining Corporate Defendants' and Store-Level Defendants' motions to dismiss Plaintiff's ADA claim, but grants the Above-Store Defendants' motions to dismiss Plaintiff's ADA claim.

## III.     Racial Discrimination, 42 U.S.C. § 1981

Plaintiff brings a claim against all defendants under 42 U.S.C. § 1981, which allows claims by individuals who are discriminated against because of their race. Amended Complaint at ¶¶ 140-64. To establish a prima facie case of discrimination in a § 1981 cause of action relating to the purchase of goods or services, Plaintiff, an African-American, must establish he (1) belongs to a protected class of people; (2) sought to enter into a contractual relationship with Defendants; (3) met

28

Defendants' ordinary requirements to pay for and to receive goods or services ordinarily provided by Defendants to other similarly situated customers; and (4) was denied the opportunity to contract for goods or services that was otherwise afforded to white customers. *Williams v. Staples, Inc.*, 372 F.3d 662, 667 (4th Cir. 2004); *cf. Gilyard v. Northlake Foods, Inc.*, 367 F. Supp. 2d 1008, 1013-15 (E.D. Va. 2005) (applying the *Williams* test in the context of a motion to dismiss under Fed. R. Civ. P. 12(b)(6)).  Defendants in a § 1981 lawsuit can be held personally liable in their individual capacities "when they intentionally cause a corporation to infringe the rights secured by" § 1981. *Tillman v. Wheaton-Haven Recreation Ass'n, Inc.*, 517 F.2d 1141, 1146 (4th Cir. 1975); *see also Al-Khazraji v. Saint Francis Coll.*, 784 F.2d 505, 518 (3d Cir. 1986) (citing the holding in *Tillman* and stating "directors, officers, and employees of a corporation may become personally liable when they intentionally cause an infringement of rights protected by Section 1981, regardless of whether the corporation may also be held liable"), *aff'd*, 481 U.S. 604 (1987).

Defendants argue Plaintiff cannot state a claim under § 1981 because he was not denied the ability to purchase CVS's goods and services.  ECF No. 20-1 at 12-14; ECF No. 21-1 at 5; ECF No. 22-1 at 2.  They also argue Plaintiff's complaint does not contain allegations sufficient to hold the Store-Level or Above-Store Defendants liable under § 1981.  ECF No. 21-1 at 5-6; ECF No. 22-1 at 2-4.

The Court finds that at this stage of the proceedings, Plaintiff has pleaded sufficient facts to state a plausible claim under § 1981 against the remaining Corporate Defendants and the following Store-Level Defendants: Gates, Pendergrass, Sosa, and Keeler.  First, Plaintiff is African-American and therefore is a member of a protected class.  *See* 42 U.S.C. § 1981(a) (granting all people within the United States "the same right . . . to make and enforce contracts . . . as is enjoyed by white

29

citizens"). Second, Plaintiff sought to enter into a contractual relationship with CVS when he attempted to shop there and have prescriptions filled. Third, Plaintiff's allegations indicate he met the ordinary requirements to pay for and receive goods, such as his prescription refills, at any one of the CVS retail establishments. Finally, the remaining Corporate Defendants, Gates, Pendergrass, Sosa, and Keeler denied Plaintiff the opportunity to enter into a contract with CVS even though four CVS stores afforded such an opportunity—in actuality, opportuni*ties*—to Plaintiff's white female friend. *See Williams*, 372 F.3d at 667-68. The Court therefore denies the motions to dismiss Plaintiff's § 1981 claim against the remaining Corporate Defendants (South Carolina CVS Pharmacy, LLC and CVS Pharmacy, Inc.), Gates, Pendergrass, Sosa, and Keeler.

However, regarding the Above-Store Defendants and the remaining Store-Level Defendants (Brescia, Cessna, Chisholm, Combs, McClure, Poland, Webb, John Doe #1, Jane Doe #1, and Jane Doe #2), the Court finds Plaintiff has failed to plead sufficient facts to support a reasonable inference that these particular defendants committed any actions in violation § 1981. Plaintiff's allegations relating to these defendants do not fulfill the fourth prong of the *Williams* test because he does not allege any of them treated him differently from white customers. The Court therefore grants these defendants' motions to dismiss Plaintiff's § 1981 claim.

## IV.    Conspiracy to Interfere with Civil Rights, 42 U.S.C. § 1985(3)

Plaintiff brings a claim against all Defendants under 42 U.S.C. § 1985(3). Amended Complaint at ¶¶ 165-87. Defendants argue Plaintiff has neither sufficiently pled the prima facie elements of a § 1985(3) claim, nor alleged a meeting of the minds to state a claim for conspiracy. ECF No. 20-1 at 15, 17-18. They also argue the intracorporate conspiracy doctrine bars Plaintiff's § 1985(3) claim. ECF No. 20-1 at 15-17.

30

### A.    § 1985(3) Conspiracy Claim

Section 1985(3) permits claims by plaintiffs who are injured by a conspiracy formed "for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws."  42 U.S.C. § 1985(3). To state a claim under § 1985(3), a plaintiff must prove (1) a conspiracy by two or more persons, (2) who are motivated by a specific, class-based, invidiously discriminatory purpose to (3) deprive the plaintiff of the equal enjoyment of rights secured by law to all, (4) that results in injury to the plaintiff as (5) a consequence of an overt act committed by the defendants in connection with the conspiracy.  *A Society Without A Name v. Virginia*, 655 F.3d 342, 346 (4th Cir. 2011).  "Moreover, the law is well settled that to prove a section 1985 'conspiracy,' a claimant must show an agreement or a 'meeting of the minds' by defendants to violate the claimant's constitutional rights."  *Simmons v. Poe*, 47 F.3d 1370, 1377 (4th Cir. 1995).

### B.    Intracorporate Conspiracy Doctrine

The intracorporate conspiracy doctrine, also known as the intracorporate immunity doctrine, "recognizes that a corporation cannot conspire with its agents because the agents' acts are the corporation's own."  *Painter's Mill Grille, LLC v. Brown*, 716 F.3d 342, 352 (4th Cir. 2013) (applying the doctrine in the context of a § 1985(3) action).  "As such, suing the agents individually does not destroy the immunity granted under the doctrine."  *Id.* at 353 (internal quotation marks omitted).  The doctrine does not apply if a coconspirator has a personal stake independent of his relationship to the corporation or if the corporation did not authorize the agent's acts.  *Id.*

Plaintiff contends the intracorporate conspiracy doctrine does not apply in this case because of the allegations concerning non-CVS individuals, namely the group of four or more people who

31

allegedly surrounded him at the behest of Defendant Pendergrass and the white male truck driver who accosted and threatened him. ECF No. 39 at 14-16. Plaintiff also argues the intracorporate conspiracy doctrine is inapplicable because he has alleged the CVS employees were dominated by personal motives or acted outside the scope of their corporate duties. *Id.* at 16.

### C.    Analysis

The Court finds Plaintiff has alleged a prima facie claim under 42 U.S.C. § 1985(3) against the remaining Corporate Defendants and the Store-Level Defendants, but not against the Above-Store Defendants. The complaint contains sufficient facts alleging the remaining Corporate Defendants and the Store-Level Defendants overtly acted together to impede Plaintiff, an African-American, from shopping in CVS stores, which all people can patronize by law, and caused him to suffer physical and mental anguish. These defendants may very well be entitled to summary judgment based on the intracorporate conspiracy doctrine, failure to establish a meeting of the minds, or some other available defense. Yet, at the pleading stage of this litigation, the Court concludes Plaintiff's allegations are adequate to state a § 1985(3) claim for conspiracy that is plausible on its face against the remaining Corporate Defendants and the Store-Level Defendants.

Plaintiff has, however, failed to plead any facts creating a reasonable inference that the Above-Store Defendants participated in a conspiracy against him with a class-based discriminatory motive. Thus, the complaint does not contain sufficient facts alleging the Above-Store Defendants conspired to deprive Plaintiff of his constitutional rights under § 1985(3).

In conclusion, the Court denies the motions to dismiss the § 1985(3) claim filed by the remaining Corporate Defendants and the Store-Level Defendants. The Court grants the Above-Store Defendants' motion to dismiss the § 1985(3) conspiracy claim.

## V.    Failure to Prevent Deprivation of Rights, 42 U.S.C. § 1986

Plaintiff brings a claim against all Defendants under 42 U.S.C. § 1986, which provides a cause of action against anyone who has "knowledge that any of the wrongs conspired to be done, and mentioned in [42 U.S.C. § 1985], are about to be committed, and having power to prevent or aid in preventing the commission of the same, neglects or refuses so to do."  42 U.S.C. § 1986; *see* Amended Complaint at ¶¶ 188-95.  "A cause of action based upon § 1986 is dependent upon the existence of a claim under § 1985."  *Trerice v. Summons*, 755 F.2d 1081, 1085 (4th Cir. 1985).

Defendants argue Plaintiff's § 1986 claim fails because he cannot establish a § 1985(3) claim and because he has not pleaded they had knowledge of any alleged conspiracy to harm him. ECF No. 20-1 at 18-19; ECF No. 21-1 at 7; ECF No. 22-1 at 2-4.  Again, the Court notes that while Defendants may be entitled to summary judgment on Plaintiff's § 1985(3) claim and thus entitled to it on his § 1986 claim, Plaintiff has alleged sufficient facts establishing the remaining Corporate Defendants and the Store-Level Defendants had knowledge of a race-based conspiracy against Plaintiff and had the power to prevent or aid in the prevention of it.  *See* 42 U.S.C. § 1986. However, because the Court has also found that the complaint does not contain sufficient facts alleging the Above-Store Defendants conspired to deprive Plaintiff of his constitutional rights under § 1985(3), the Court dismisses the § 1986 claim as to the Above-Store Defendants.  *See Trerice*, 755 F.2d at 1085.

Accordingly, the Court denies the motions to dismiss Plaintiff's § 1986 claim filed by the remaining Corporate Defendants and Store-Level Defendants.  The Court grants the Above-Store Defendants' motion to dismiss the § 1986 claim.

## VI.    Discrimination under Title VI of the Civil Rights Act of 1964

33

Plaintiff asserts a claim against the Corporate Defendants under Title VI of the Civil Rights Act of 1964, a statute that prohibits federally assisted programs from discriminating against a person on the basis of his race, color, or national origin. 42 U.S.C. § 2000d; *see* Amended Complaint at ¶¶ 196-204. To prevail on a claim under Title VI, a plaintiff must prove that the defendant received federal financial assistance and that the defendant engaged in intentional discrimination based on race, color, or national origin. *See Alexander v. Sandoval*, 532 U.S. 275, 280 (2001). "[T]he proper defendant in a Title VI case is an entity rather than an individual." *Farmer v. Ramsay*, 41 F. Supp. 2d 587, 592 (D. Md. 1999).

The remaining Corporate Defendants seek dismissal of Plaintiff's Title VI claim for the same reason they seek dismissal of his § 1981 claim, arguing he was never denied the opportunity to purchase goods or services from CVS. ECF No. 20-1 at 14. They may ultimately be correct. However, Plaintiff has alleged that the remaining Corporate Defendants engaged in intentional discrimination based on race, as the Court discusses in its analysis of Plaintiff's § 1981 claim, and that they received federal financial assistance. Given these allegations, the Court denies the remaining Corporate Defendants' motion to dismiss Plaintiff's Title VI claim.[13]

## VII.  Discrimination under Section 1557 of the Affordable Care Act, 42 U.S.C. § 18116

Plaintiff seeks to bring a claim under Section 1557 of the Patient Protection and Affordable Care Act[14] ("ACA") against the Corporate Defendants, alleging they discriminated against him on

---

[13]    The Above-Store Defendants and Store-Level Defendants argue any Title VI claim against them should be dismissed because, as individuals, they do not receive federal financial assistance. ECF No. 21-1 at 6-7; ECF No. 22-1 at 2; *see Farmer*, 41 F. Supp. 2d at 592 (stating "the proper defendant in a Title VI case is an entity rather than an individual"). In response, Plaintiff states he did not assert a Title VI claim against the Above-Store Defendants and Store-Level Defendants, all of whom are individuals. ECF No. 30-1 at 6.

[14]    42 U.S.C. § 18001, *et seq.*

34

the basis of his race, gender, and disability.[15]  Amended Complaint at ¶¶ 205-222.  The Corporate

Defendants' primary argument in support of their motion to dismiss is that CVS is not a "health

program or activity" as defined in Section 1557.  *See* ECF No. 20-1 at 19-21.  Although the

Corporate Defendants do not dispute Plaintiff's ability to bring a claim under Section 1557, this

issue is a matter of first impression requiring the Court to determine whether Section 1557 creates a

private cause of action.

### A.    A Private Cause of Action Under Section 1557

"Section 1557 references and incorporates four different civil rights statutes: Title VI, which

prohibits discrimination on the basis of race, color, and national origin; Title IX, which prohibits

discrimination on the basis of sex; the Age Discrimination Act, which prohibits discrimination on

the basis of age; and section 504 of the Rehabilitation Act, which prohibits discrimination on the

basis of disability."  *Rumble v. Fairview Health Servs.*, No. 14-CV-2037 SRN/FLN, 2015 WL

1197415, at *10 (D. Minn. Mar. 16, 2015) (citing 42 U.S.C. § 18116).  Section 1557 is entitled

"**Nondiscrimination**" and provides:

> **(a) In general**
>
> Except as otherwise provided for in this title (or an amendment
> made by this title), an individual shall not, on the ground
> prohibited under title VI of the Civil Rights Act of 1964 (42 U.S.C.
> 2000d et seq.), title IX of the Education Amendments of 1972 (20
> U.S.C. 1681 et seq.), the Age Discrimination Act of 1975 (42
> U.S.C. 6101 et seq.), or section 504 of the Rehabilitation Act of
> 1973 (29 U.S.C. 794), be excluded from participation in, be denied
> the benefits of, or be subjected to discrimination under, any health
> program or activity, any part of which is receiving Federal financial

---

[15]    In his response to the Store-Level Defendants' motion to dismiss, Plaintiff states, "Count VI (ACA § 1557)
was not asserted against the individual defendants."  ECF No. 30-1 at 8-9.  Additionally, Plaintiff's counsel stated
at the hearing that Plaintiff has brought a Section 1557 claim only against the Corporate Defendants, not against the
individual Above-Store or Store-Level Defendants.  Transcript at 48.

assistance, including credits, subsidies, or contracts of insurance, or under any program or activity that is administered by an Executive Agency or any entity established under this title (or amendments). The enforcement mechanisms provided for and available under such title VI, title IX, section 504, or such Age Discrimination Act shall apply for purposes of violations of this subsection.

**(b) Continued application of laws**

Nothing in this title (or an amendment made by this title) shall be construed to invalidate or limit the rights, remedies, procedures, or legal standards available to individuals aggrieved under title VI of the Civil Rights Act of 1964 (42 U.S.C. 2000d et seq.), title VII of the Civil Rights Act of 1964 (42 U.S.C. 2000e et seq.), title IX of the Education Amendments of 1972 (20 U.S.C. 1681 et seq.), section 504 of the Rehabilitation Act of 1973 (29 U.S.C. 794), or the Age Discrimination Act of 1975 (42 U.S.C. 611 et seq.), or to supersede State laws that provide additional protections against discrimination on any basis described in subsection (a).

**(c) Regulations**

The Secretary may promulgate regulations to implement this section.

42 U.S.C. § 18116.

### 1.    Judicial Review of Section 1557

No court in the Fourth Circuit has had occasion to analyze Section 1557 of the ACA.  Two courts in other circuits have issued decisions holding Section 1557 creates a private cause of action: *Rumble*, *supra*, and *Southeastern Pennsylvania Transportation Authority v. Gilead Sciences, Inc.*, __ F. Supp. 3d __, __, 2015 WL 1963588 (E.D. Pa. May 4, 2015).  In *Rumble*,[16] the plaintiff alleged the defendants discriminated against him on the basis of his sex, in violation of Section 1557.  2015 WL 1197415, at *7.  The district court first found Section 1557 provided the plaintiff with a private

---

[16]    The *Rumble* court issued its decision on March 16, 2015, noting, "To the [c]ourt's knowledge, this is the first case that requires interpretation of Section 1557."  2015 WL 1197415, at *9.

right of action to sue the defendants. *Id.* at *7 n.3 ("The Court reaches this conclusion because the four civil rights statutes that are referenced and incorporated into Section 1557 permit private rights of action. Because Section 1557 states that the enforcement mechanisms available under those four statutes apply to violations of Section 1557, Section 1557 necessarily also permits private causes of action." (internal citations omitted)). Second, the court noted "the language of Section 1557 is ambiguous" to the extent that the four federal civil rights statutes cited in Section 1557 "utilize different standards for determining liability, causation, and a plaintiff's burden of proof." *Id.* at *10. The court concluded, "Congress likely referenced the four civil rights statutes mainly in order to identify the ground[s] on which discrimination is prohibited—i.e., race, sex, age, and disability. Congress also likely intended that the same standard and burden of proof to apply to a Section 1557 plaintiff, regardless of the plaintiff's protected class status." *Id.* at *12 (alteration in original). However, the court declined to determine the precise standard and burden of proof to apply to a Section 1557 lawsuit. *Id.*

In *Southeastern Pennsylvania Transportation Authority*, the plaintiff asserted a claim for discrimination under Section 1557 on the basis of race and disability. 2015 WL 1963588 at *3-4. The district court determined Congress intended to create a private right of action for alleged violations of Section 1557. *Id.* at *6. The court, however, disagreed with *Rumble*'s holding that the same standard and burden of proof apply in a Section 1557 claim regardless of the type of discrimination alleged. *Id.* at *6 n.3. It found that while Section 1557 creates a private right of action, "the rights of action and corresponding remedies, including all of their limitations, are to be drawn from the four federal civil rights statutes listed in 42 U.S.C. § 18116(a) and applied depending upon the nature of the discrimination alleged by a putative Section 1557 plaintiff." *Id.*

Thus, regarding the plaintiff's race claim, the court applied the elements required to state a claim under Title VI of the Civil Rights Act of 1964. *Id.* at *8 ("To state a claim under Title VI of the Civil Rights Act, a plaintiff must show that he or she (1) was a member of a protected class, (2) qualified for the benefit or program at issue, (3) suffered an adverse action, and (4) the adverse action occurred under circumstances giving rise to an inference of discrimination."). As to the plaintiff's disability claim, the court applied the elements required to establish a claim of discrimination under Section 504 of the Rehabilitation Act of 1973. *Id.* at *6 ("To state a claim under Section 504, a plaintiff must demonstrate that she is (1) a qualified individual with a disability (2) who was denied the benefits of a program or activity which receives federal funds (3) on the basis of her disability.").

## 2.    Analysis

To decide whether Section 1557 creates a private cause of action, the Court must first look to the plain language of the statute. *Rubin v. United States*, 449 U.S. 424, 430 (1981). Congress may create, either through a statute's explicit language or by its implication, a private right of action to enforce federal law. *Alexander v. Sandoval*, 532 U.S. 275, 286 (2001); *see Touche Ross & Co. v. Redington*, 442 U.S. 560, 575 (1979) ("The central inquiry remains whether Congress intended to create, either expressly or by implication, a private cause of action."). The Court must determine whether the statute "displays an intent to create not just a private right but also a private remedy"; statutory intent is dispositive as to whether a private remedy exists. *Id.* Absent statutory intent, no cause of action exists and a court may not create one, "no matter how desirable that might be as a policy matter, or how compatible with the statute." *Id.* at 286-87. When a federal statute does not expressly create a private right of action but references and incorporates another federal statute, it is

possible to find an implied right of action in the statute. *See Barnes v. Gorman*, 536 U.S. 181, 185 (2002) (finding that although neither Section 202 of the ADA nor Section 504 of the Rehabilitation Act explicitly provide for a private cause of action, they implicitly create one due to their cross-references to each other and to Title VI of the Civil Rights Act of 1964).

Section 1557 cross-references four federal civil rights statutes: Title VI of the Civil Rights Act of 1964, Title IX of the Education Amendments of 1972, the Age Discrimination Act of 1975, and Section 504 of the Rehabilitation Act of 1973. 42 U.S.C. § 18116(a). The respective prohibitions of those four statutes are discrimination based on race, sex, age, and disability. *See* 42 U.S.C. § 2000d; 20 U.S.C. § 1681(a); 42 U.S.C. § 6102; 29 U.S.C. § 794(a). The statutory language for nondiscrimination in Section 1557 mirrors that used in the four civil rights statutes. *Compare* 42 U.S.C. § 18116(a) (stating "an individual shall not, on the ground prohibited under [the four federal civil rights statutes], be excluded from participation in, be denied the benefits of, or be subjected to discrimination under, any health program or activity, any part of which is receiving Federal financial assistance, including credits, subsidies, or contracts of insurance"), *with* 42 U.S.C. § 2000d ("No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."), 20 U.S.C. § 1681(a) (stating "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance"), 42 U.S.C. § 6102 (providing "no person in the United States shall, on the basis of age, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under, any program or activity receiving Federal financial assistance"), *and* 29

U.S.C. § 794(a) (stating "[n]o otherwise qualified individual with a disability in the United States, as defined in section 705(20) of this title, shall, solely by reason of her or his disability, be excluded from the participation in, be denied benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance").

The Court agrees with the District of Minnesota and the Eastern District of Pennsylvania that Section 1557 cross-references the four federal civil rights statutes to classify the four categories of discrimination—race, sex, age, and disability—prohibited by Section 1557. *See Rumble*, 2015 WL 1197415, at *7 n.3; *Se. Pennsylvania Transp. Auth.*, 2015 WL 1963588, at *6. The Court finds Congress intended to create a private right and private remedy for violations of Section 1557 by expressly incorporating the enforcement provisions of the four federal civil rights statutes. *Se. Pennsylvania Transp. Auth.*, 2015 WL 1963588, at *6. In short, the Court concludes Section 1557 creates a private cause of action.[17]

Having determined an individual plaintiff can sue under Section 1557, the Court will address the remaining Corporate Defendants' motion to dismiss Plaintiff's Section 1557 claim.

**B.    Motion to Dismiss Plaintiff's Section 1557 Claim**

In seeking dismissal of Plaintiff's Section 1557 claim, the remaining Corporate Defendants argue Plaintiff fails to state a claim because (1) CVS is not a "health program or activity" as defined in Section 1557 and (2) Plaintiff was not denied access to CVS's goods or services. ECF No. 20-1 at 19-21. Plaintiff argues in response that the anti-discrimination mandate of Section 1557 applies

---

[17]    As discussed below, the proposed regulations for Section 1557 specify, "An individual or entity may bring a civil action to challenge a violation of Section 1557 or this part in a United States District Court in which the recipient or State-based Marketplace is found or transacts business." Procedures for Health Programs and Activities Conducted by Recipients and State-based Marketplaces, 80 Fed. Reg. 173, 54220 (Sept. 9, 2015) (to be codified at 45 C.F.R. § 92.302).

to health care activities, not just health insurance as the Corporate Defendants suggest.  ECF No. 39 at 21-26.  He asserts that as a pharmacy, CVS engages in health care activities as contemplated by the statute.  *Id.* at 21-23.  He also claims his complaint contains sufficient allegations that CVS receives federal funds and that Defendants denied him the ability to purchase CVS goods or services based on his race, gender, and disability.  *Id.* at 24-26.

### 1.    "Health Program or Activity"

The relevant portion of Section 1557 at issue contains the following language: "an individual shall not . . . be excluded from participation in, be denied the benefits of, or be subjected to discrimination under, ***any health program or activity***, any part of which is receiving Federal financial assistance, including credits, subsidies, or contracts of insurance."  42 U.S.C. § 18116(a) (emphasis added).  In arguing CVS is not a "health program or activity" within the meaning of Section 1557, the remaining Corporate Defendants rely on the definition given in the Request for Information that the United States Department of Health and Human Services ("HHS")[18] issued on August 1, 2013, as part of its process for issuing regulations to implement Section 1557.  ECF No. 20-1 at 20 (citing Request for Information Regarding Nondiscrimination in Certain Health Programs or Activities, 78 Fed. Reg. 148, 46558 (Aug. 1, 2013)).  On September 8, 2015—two days before the Court held the hearing on the motions to dismiss—HHS published in the Federal Register a notice of proposed rulemaking, a preamble, and the proposed regulations for Section 1557.  *See*

---

[18]    HHS "is responsible for promulgating regulations pursuant to Section 1557 and the [Office for Civil Rights (OCR)], a sub-agency of HHS, is responsible for enforcing compliance with Section 1557."  *Rumble*, 2015 WL 1197415, at *10.  The Administrative Procedure Act requires federal agencies such as HHS to provide notice of proposed rules and a public comment period.  5 U.S.C. § 553; *see generally Int'l Union, United Mine Workers of Am. v. Mine Safety & Health Admin.*, 407 F.3d 1250, 1259 (D.C. Cir. 2005) (observing the notice requirements of § 553 "are designed (1) to ensure that agency regulations are tested via exposure to diverse public comment, (2) to ensure fairness to affected parties, and (3) to give affected parties an opportunity to develop evidence in the record to support their objections to the rule and thereby enhance the quality of judicial review").

Nondiscrimination in Health Programs and Activities, 80 Fed. Reg. 173, 54172 (Sept. 9, 2015).[19]

The proposed regulations, which have a public comment period lasting until November 9, 2015,

contain numerous definitions and explanations for the statutory language of Section 1557, including

"health program or activity." *See id.* at 54214-21.  Before it can address the merits of the remaining

Corporate Defendants' argument or look for guidance in HHS's proposed regulations, the Court

must determine whether the language at issue—"health program or activity"—in Section 1557 is

plain or whether it is ambiguous.

        In deciding whether to rely on HHS's interpretation of Section 1557, the Court would

ordinarily have to apply the two-step process set forth in *Chevron, U.S.A., Inc. v. Natural Resources

Defense Council, Inc.*, 467 U.S. 837, 842-44 (1984) (establishing the two-step process to guide

judicial review of a federal agency's interpretation of a statute).  The Court would first have to

"determine whether the plain language of the statute directly addresses the precise question before

[it]."  *Yi v. Fed. Bureau of Prisons*, 412 F.3d 526, 530 (4th Cir. 2005) (citing *Chevron*, 467 U.S. at

842-43).  If the congressional intent were clear from the statute itself, that would be "the end of the

matter; for the [C]ourt, as well as the agency, must give effect to the unambiguously expressed

intent of Congress."  *Chevron*, 467 U.S. at 842-43.  "However, if the statute is silent or ambiguous

in expressing Congress' intent," the Court would have to "defer to the agency's reasonable

construction of the statute."  *Yi*, 412 F.3d at 530 (citing *Chevron*, 467 U.S. at 843-44).

        Here, however, HHS has *proposed* but has not promulgated regulations for Section 1557.

*See* Nondiscrimination in Health Programs and Activities, 80 Fed. Reg. at 173, 54214 ("For the

---

[19]        The notice, preamble, and proposed regulations are available online at the following web address: https://www.federalregister.gov/articles/2015/09/08/2015-22043/nondiscrimination-in-health-programs-and-activities#h-84.

reasons set forth in the preamble, the Department of Health and Human Services *proposes* to add 45

CFR part 92 as follows . . . ." (emphasis added)).  These proposed regulations have no legal force or

effect and are therefore not entitled to *Chevron* deference.[20]  However, the Court may still determine

under the first step of the *Chevron* test whether the language of Section 1557 is plain or ambiguous;

should the Court find the language ambiguous, it may consider whether the proposed regulations, as

well as the preamble that precedes them, are entitled to persuasive weight under *Skidmore v. Swift &*

*Co.*, 323 U.S. 134, 140 (1944).  *See Shipbuilders Council of Am. v. U.S. Coast Guard*, 578 F.3d

234, 241 (4th Cir. 2009) (explaining the *Skidmore* "standard gives 'respect' to an agency

determination where the form and content of the ruling gives it 'power to persuade'" (quoting

*Skidmore*, 323 U.S. at 140)).

As noted above, Section 1557 prohibits discrimination based on race, sex, age, and disability

by "any health program or activity, any part of which is receiving Federal financial assistance,

including credits, subsidies, or contracts of insurance."  42 U.S.C. § 18116(a).  Neither Section 1557

nor the remainder of the ACA defines "health program or activity," and the parties disagree as to

whether a retail pharmacy outlet such as CVS qualifies as one.  Because the statute is silent as to the

meaning of "health program or activity" and because HHS has yet to promulgate final regulations,

the Court can afford only *Skidmore* deference to HHS's definition and interpretation of the phrase.

The weight the Court may afford the preamble and proposed regulations depends on "the

thoroughness evident in [HHS's] consideration, the validity of its reasoning, its consistency with

earlier and later pronouncements, and all those factors which give it power to persuade, if lacking

---

[20]    "[P]roposed regulations have no legal force or effect until they become final."  *Yocum v. United States*, 66
Fed. Cl. 579, 590 & n.14 (2005) (collecting cases).

power to control." *Skidmore*, 323 U.S. at 140.  As explained below, the Court concludes the proposed regulations provide persuasive authority to support a finding—at the 12(b)(6) stage of this litigation—that CVS provides and administers health programs or activities that fall within the meaning of Section 1557.

### 2.    HHS's Proposed Regulations

The regulations for Section 1557 will appear in Part 92 of Title 45 of the Code of Federal Regulations.  *See* 80 Fed. Reg. at 173, 54214.  The proposed purpose statement notes Section 1557 "prohibits discrimination on the basis of race, color, national origin, sex, age, or disability in certain health programs and activities," and that Part 92 "applies to health programs or activities administered by recipients of Federal financial assistance from [HHS]."  *Id.* at 54214-15 (to be codified at 45 C.F.R. § 92.1).  The proposed enforcement provision states, "An individual or entity may bring a civil action to challenge a violation of Section 1557 or this part in a United States District Court in which the recipient or State-based Marketplace is found or transacts business."  *Id.* at 54220 (to be codified at 45 C.F.R. § 92.302).  The proposed definition for "health program or activity" is as follows:

> *Health program or activity* means the provision or administration of *health-related services* or health-related insurance coverage and the provision of assistance to individuals in obtaining *health-related services* or health-related insurance coverage.  *For an entity principally engaged in providing or administering health services* or health insurance coverage, *all of its operations are considered part of the health program or activity*, except as specifically set forth otherwise in this part.  Such entities include a hospital, health clinic, group health plan, health insurance issuer, physician's practice, community health center, nursing facility, residential or community-based treatment facility, or other similar entity.  A health program or activity also includes all of the operations of a State Medicaid program.

*Id.* at 54216 (emphases added) (to be codified at 45 C.F.R. § 92.4).[21]  The above definition lists

numerous examples of types of *entities* that provide or administer health programs or activities, but

does not specifically mention retail pharmacies or drug stores.  However, HHS also provides a

proposed definition for "covered entity," stating, "*Covered entity* means: (1) An entity that operates

a health program or activity, any part of which receives Federal financial assistance; (2) An entity

established under Title I of the ACA that administers a health program or activity; and (3) The

[HHS]." *Id.* at 54214 (to be codified at 45 C.F.R. § 92.4).  This definition indicates covered entities

represent those organizations which must abide by the nondiscrimination provision of Section 1557

due to the fact that they operate or administer health programs or activities receiving any degree of

federal financial assistance.  *Cf. Rumble*, 2015 WL 1197415, at *12 (interpreting "'health program

or activity'" and concluding "as long as part of an organization or entity receives federal funding or

subsidies of some sort, the entire organization is subject to the anti-discrimination requirements of

Section 1557").  Thus, contrary to the remaining Corporate Defendants' argument, the focus need

not be limited to whether CVS itself is a health program or activity, but more broadly to whether it

is a covered entity—i.e., a recipient of federal financial assistance—that provides or administers a

health program or activity.  *See* 80 Fed. Reg. at 173, at 54214-15 (stating Part 92 "applies to health

programs or activities administered by recipients of Federal financial assistance from [HHS]" (to be

codified at 45 C.F.R. § 92.1)).

     The proposed definition for "covered entity" does not provide specific examples of what

qualifies as a covered entity, but the preamble to the proposed regulations cites numerous examples.

---

[21]    HHS notes in the preamble that "OCR continues to seek comment on programs and activities that should be considered health programs or activities." *Id.* at 54175.

*Id.* at 54172-214. Among those examples are "**retail pharmacies** (including mail-order

pharmacies)." *Id.* at 54185 (emphasis added).[22, 23] Given this specific example, and affording

*Skidmore* deference to HHS's interpretation of Section 1557, the Court may be able to conclude

CVS is a covered entity that provides health programs or activities. The Court must first look to

Plaintiff's complaint.

Plaintiff alleges "CVS/pharmacy retail establishments 'participate in the administration of

the drug benefit added to the Medicare program under Part D of the Medicare Prescription Drug

Improvement, and Modernization Act of 2003 ('Medicare Part D') through the provision of services

to (CVS) health plan clients and other clients that have qualified as Medicare Part D prescription

drug plans."[24] Amended Complaint at ¶ 6. He claims the CVS stores identified in his complaint are

---

[22]      The Court recognizes the context in which HHS provides the example of retail pharmacies—when describing the circumstances where covered entities must provide meaningful access to health programs or activities to individuals with limited English proficiency. *See id.* at 54185. Regardless of this particular context, the Court believes that in giving the retail pharmacy example, HHS implicitly assumes covered entities include retail pharmacies.

[23]      Other examples of covered entities, to name a few, include: hospitals, skilled nursing facilities, home health agencies, physical therapy programs, community health centers, health-related schools, state public health agencies, and physicians. *See id.* at 54185, 54194-95.

[24]
          Medicare Part D was established through the adoption of Title I of the Medicare
          Prescription Drug Modernization and Improvement Act of 2003 . . . , codified at 42
          U.S.C. §§ 1395w-101, *et seq.* Medicare Part D is a managed care program that uses
          private health care organizations to sponsor prescription drug benefit plans. The
          government contracts with private entities to deliver Medicare services through
          Medicare Advantage Plans . . . and Medicare prescription drug plans . . . .
          Medicare beneficiaries may choose from a number of plans with different coverage
          and prices.

*Fox v. Leavitt*, 572 F. Supp. 2d 135, 138-39 (D.D.C. 2008). As HHS notes in the preamble to the proposed regulations, Medicare Part D is federal financial assistance. *See* 80 Fed. Reg. 173, 54191 n.94 ("We will ask, for example, whether the plan itself receives Federal financial assistance, such as through receipt of Medicare Part D payments."). The proposed definition for "federal financial assistance" is:

          *Federal financial assistance.*

          (1) Federal financial assistance means any grant, loan, credit, subsidy, contract

"principally engaged in the retail sale of prescription pharmaceuticals and provision of health care and/or medical- and health-related supplies and/or products." *Id.* at ¶ 30. He asserts "the Defendants meet the qualifications for being a 'health program or activity, any part of which is receiving Federal financial assistance' under Section 1557(a)." *Id.* at ¶ 217 (quoting 42 U.S.C. § 18116(a)). Finally, Plaintiff alleges he not only wanted to shop at CVS but also wanted to have his prescriptions filled there, and that he "has been aggrieved . . . in the denial of access to . . . prescription pharmaceuticals." *Id.* at ¶¶ 67, 219.

Evaluating Plaintiff's allegations at the 12(b)(6) stage, the Court finds that because he has alleged the CVS stores at issue in this case receive federal funds in the form of Medicare Part D and are principally engaged in the retail sale of pharmaceutical drugs—which can be fairly construed as health-related services—there is a plausible inference that the remaining Corporate Defendants are covered entities subject to the nondiscrimination provision in Section 1557. The Court is strongly persuaded by the language in HHS's proposed amendments, and more importantly, that in its preamble presuming "retail pharmacies" qualify as entities covered by Section 1557. *See* 80 Fed.

---

(other than a procurement contract but including a contract of insurance), or any other arrangement by which the Federal government provides or otherwise makes available assistance in the form of: (i) Funds; (ii) Services of Federal personnel; or (iii) Real and personal property or any interest in or use of such property, including: (A) Transfers or leases of such property for less than fair market value or for reduced consideration; and (B) Proceeds from a subsequent transfer or lease of such property if the Federal share of its fair market value is not returned to the Federal government.

(2) Federal financial assistance provided or administered by the Department includes all tax credits under Title I of the ACA, as well as payments, subsidies, or other funds extended by the Department to any entity providing health insurance coverage for payment to or on behalf of an individual obtaining health insurance coverage from that entity or extended by the Department directly to such individual for payment to any entity providing health insurance coverage.

*Id.* at 54216 (to be codified at 45 C.F.R. § 92.4).

Reg. 173, 54185, 54215-16.  The Court does not reach this conclusion lightly, and while judicial

review of Section 1557 is only in its early stages, the Court remains cognizant of the fact that

"Section 1557 is unique among Federal civil rights laws in that it specifically addresses

discrimination in health programs and activities."  *Id.* at 54182.

The Court finds Plaintiff has sufficiently alleged (1) that CVS, by virtue of its retail

pharmacy operations and receipt of federal funds, is a covered entity that provides or administers

health programs or activities, namely "the retail sale of prescription pharmaceuticals"; and (2) that

he was denied the right to have his prescriptions filled at CVS stores.  Amended Complaint at ¶¶ 30,

67, 219; *see* 42 U.S.C. § 18116(a) (stating "an individual shall not . . . be excluded from

participation in, be denied the benefits of, or be subjected to discrimination under, any health

program or activity, any part of which is receiving Federal financial assistance, including credits,

subsidies, or contracts of insurance").  Given these allegations, the Court concludes Plaintiff has

stated a plausible claim under Section 1557 for discrimination based on his race, gender, and

disability.[25]  The Court denies the remaining Corporate Defendants' motion to dismiss this claim.

---

[25]    If the Section 1557 claim is attacked at the summary judgment stage, it will become necessary to determine
the precise standard(s) and burden(s) of proof to apply to the types of discrimination (race, gender, and disability)
alleged in Plaintiff's complaint.  Because Plaintiff has alleged a plausible claim under Title VI of the Civil Rights
Act of 1964 against the remaining Corporate Defendants based on his race (as explained in the previous section of
this order), he may also have stated a plausible claim against them under Section 1557.  *Cf. Se. Pennsylvania Transp.
Auth.*, 2015 WL 1963588, at *8 (applying the elements of a Title VI claim to determine if the plaintiff had stated a
cause of action under Section 1557 based on his race).  It would be more difficult to determine whether Plaintiff has
a viable Section 1557 claim based on his gender and disability.  If the Court were to apply the reasoning in
*Southeastern Pennsylvania Transportation Authority*, Plaintiff would have to satisfy the elements required to state
claims under Section 504 of the Rehabilitation Act of 1973—for his disability—and Title IX of the Education
Amendments of 1972—for his gender.  *See generally Johnson v. Solomon*, 484 F. Supp. 278, 312 n.59 (D. Md. 1979)
(recognizing that to state a claim under Section 504, a plaintiff must allege "that he was a 'handicapped person'
within the terms of the Act, that he was discriminated against solely because of his handicap, and that the program
or activity discriminating against him receives federal financial assistance"); *Alston v. Virginia High Sch. League,
Inc.*, 176 F.R.D. 220, 223 (W.D. Va. 1997) (recognizing that to state a claim under Title IX, a plaintiff must allege
(1) he was excluded from participation in, denied the benefits of, or subjected to discrimination in an educational
program; (2) the program receives federal assistance; and (3) the exclusion from the program was on the basis of the
plaintiff's gender (citing 20 U.S.C. § 1681(a)).  On the other hand, if the Court were to follow *Rumble*, the same

## VIII.    State Law Claims

To summarize Plaintiff's state law claims and clarify the parties against whom these claims are asserted, the Court notes Plaintiff (a) sues the Corporate Defendants, Defendant Pendergrass, and one or more John and Jane Doe defendants for assault, battery, and false imprisonment; (b) sues the Corporate Defendants, Pendergrass, Keeler, and at least some of the John and Jane Doe defendants for intentional infliction of emotional distress; (c) sues all Defendants for civil conspiracy, negligence, negligent supervision and/or retention, intentional interference with contract and/or prospective contractual relations; and (d) sues the Corporate Defendants for unfair trade practices.  *See* Amended Complaint at ¶¶ 223-356.

### A.    Assault, Battery, and False Imprisonment

Plaintiff brings claims for assault, battery, and false imprisonment against Pendergrass[26] and one or more John and Jane Doe defendants, and against the Corporate Defendants under a theory of respondeat superior.  *Id.* at ¶¶ 223-59.  Pendergrass presents the following arguments: (1) regarding the assault claim, she contends her alleged conduct (reaching to remove the sports towel worn by Plaintiff) on which Plaintiff bases his claim does not rise to the level of an actionable assault under South Carolina law, and that Plaintiff has not alleged her actions created a reasonable fear of bodily harm; (2) concerning the battery claim, she argues the alleged conduct was not violent, offensive, or harmful in nature; and (3) as to the false imprisonment claim, she asserts Plaintiff's allegations do

---

standard and burden of proof would apply regardless of the type of discrimination alleged.  Given the dearth of case law in this circuit addressing claims under Section 1557, the Court declines to determine at the 12(b)(6) stage the precise standard(s) and burden(s) to apply to the types of discrimination alleged in Plaintiff's complaint.

[26]    As for the other Store-Level Defendants (i.e., those besides Pendergrass), the Court notes Plaintiff has not brought a claim against them because he states he "only alleged that Ida Pendergrass and one or more of the John Doe and Jane Doe Defendants are liable for assault, battery, and false imprisonment."  ECF No. 30-1 at 9.

not indicate she intended to restrain Plaintiff in any way and maintains Plaintiff assented to any alleged restraint. ECF No. 21-1 at 9-12. The remaining Corporate Defendants argue Plaintiff has not alleged sufficient facts satisfying the elements of claims for assault, battery, and false imprisonment under South Carolina common law. ECF No. 20-1 at 21-22. Additionally, the remaining Corporate Defendants argue they are not liable for the actions of Pendergrass because Plaintiff's allegations do not establish a sufficient basis for respondeat superior, given that he claims a CVS employee acted outside the scope of her employment. ECF No. 20-1 at 22-23.

### 1.    Applicable Law

"An assault is an attempt or offer, with force or violence, to inflict bodily harm on another or engage in some offensive conduct." *Mellen v. Lane*, 377 S.C. 261, 276, 659 S.E.2d 236, 244 (Ct. App. 2008). An assault occurs when a person has been placed in reasonable fear of bodily harm by the conduct of the defendant. *Gathers v. Harris Teeter Supermarket, Inc.*, 282 S.C. 220, 230, 317 S.E.2d 748, 754 (Ct. App. 1984). The elements of assault include (1) conduct of the defendant that places the plaintiff (2) in reasonable fear of bodily harm. *Mellen*, 377 S.C. at 276, 659 S.E.2d at 244.

"A battery is the actual infliction of any unlawful, unauthorized violence on the person of another, irrespective of its degree; it is unnecessary that the contact be by a blow, as any forcible contact is sufficient[.]" *Gathers*, 282 S.C. at 230, 317 S.E.2d at 754. In general, a battery occurs by "the unlawful touching or striking of another by the aggressor himself or by any substance put in motion by him, done with the intention of bringing about a harmful or offensive contact which is not legally consented to by the other, and not otherwise privileged." *Mellen*, 377 S.C. at 277, 659 S.E.2d at 244. Battery "is sometimes defined as any injury done to the person of another in a rude,

50

insolent, or revengeful way." *Id.* "Physical injury is not an element of battery. While there must be a touching, any forcible contact, irrespective of its degree, will suffice." *Id.* at 277, 659 S.E.2d at 245.

"False imprisonment is the deprivation of one's liberty without justification." *Argoe v. Three Rivers Behavioral Health, L.L.C.*, 392 S.C. 462, 473, 710 S.E.2d 67, 73 (2011). To state a claim for false imprisonment, a plaintiff must allege (1) the defendant restrained him and the restraint was (2) intentional and (3) unlawful. *Id.* False imprisonment "does not require an actual injurious touching," and it may occur "by words alone, or by acts alone or by both, and by merely operating on the will of the individual, or by personal violence, or by both." *Jones by Robinson v. Winn-Dixie Greenville, Inc.*, 318 S.C. 171, 175, 456 S.E.2d 429, 432 (Ct. App. 1995).

Under the doctrine of respondeat superior, a principal is liable for the acts of its agent, not because of its consent to be liable, but by operation of law. *S. Carolina Ins. Co. v. James C. Greene & Co.*, 290 S.C. 171, 183, 348 S.E.2d 617, 624 (Ct. App. 1986). "This is most plainly illustrated in those cases where the agent acts against the express instructions of his principal, but within the scope of his employment: the principal is still liable." *Id.* "[T]he master is liable for the torts of his servant even when the servant acts against the express instructions of his master, so long as the servant acts to further the master's business." *Wade v. Berkeley Cnty.*, 330 S.C. 311, 318-19, 498 S.E.2d 684, 688 (Ct. App. 1998).

### 2.    Analysis

The Court finds that based on the alleged incident outside CVS Store #3199 involving Pendergrass, Plaintiff has stated plausible claims for assault, battery, and false imprisonment against Pendergrass, and by virtue of the doctrine of respondeat superior, against the remaining Corporate

51

Defendants.  Plaintiff sufficiently states claims for assault and battery because he alleges that Pendergrass "reached for the sports towel" he was wearing, that he "jumped back, that "Pendergrass again reached for the sports towel, as if to remove it from [his] head," and "grabbed [him] by the shoulder and shook him."  Amended Complaint at ¶¶ 81-82.  Plaintiff sufficiently states a claim for false imprisonment because he alleges Pendergrass called over a group of at least four people, who surrounded Plaintiff, and that she "stood on the inside of the driver's side door, thereby preventing [Plaintiff] from closing it and leaving."  *Id.* at ¶ 82.  These allegations contain sufficient facts to state plausible claims for assault, battery, and false imprisonment.

Because Plaintiff has plausible claims against Pendergrass and alleges she is an employee of the remaining Corporate Defendants, *see id.* at ¶ 79, he can hold the remaining Corporate Defendants liable for Pendergrass's actions under the doctrine of respondeat superior.  *See S. Carolina Ins. Co.*, 290 S.C. at 183, 348 S.E.2d at 624.  Liberally construed, Plaintiff's allegations indicate that while Pendergrass may have bullied and insulted Plaintiff, she simultaneously acted to further the Corporate Defendants' business by discussing with Plaintiff how he could shop in the store, by denying his request for a special shopping accommodation, and by telling him nobody would attack him inside the store.  *Id.* at ¶¶ 80-81; *see Wade*, 330 S.C. at 318-19, 498 S.E.2d at 688.  The Court therefore denies the motion to dismiss filed by Pendergrass and the remaining Corporate Defendants.

**B.**    **Intentional Infliction of Emotional Distress**

Plaintiff brings a claim for intentional infliction of emotional distress ("IIED") against Pendergrass, Keeler, and at least some of the John and Jane Doe defendants, and against the Corporate Defendants under a theory of respondeat superior.  Amended Complaint at ¶¶ 260-77.

To state a claim for IIED, also known as the tort of outrage, the plaintiff must allege:

> (1) the defendant intentionally or recklessly inflicted severe emotional distress, or was certain, or substantially certain, that such distress would result from his conduct; (2) the conduct was so extreme and outrageous so as to exceed all possible bounds of decency and must be regarded as atrocious, and utterly intolerable in a civilized community; (3) the actions of the defendant caused plaintiff's emotional distress; and (4) the emotional distress suffered by the plaintiff was severe such that no reasonable man could be expected to endure it.

*Hansson v. Scalise Builders of S. Carolina*, 374 S.C. 352, 356, 650 S.E.2d 68, 70 (2007).

Pendergrass and Keeler contend that Plaintiff's IIED claim is merely a restatement of his other claims, that none of their alleged conduct is so extreme and outrageous as to exceed all possible bounds of decency, and that the complaint fails to allege emotional distress so severe that no reasonable person could be expected to endure it. ECF No. 21-1 at 12-14. The remaining Corporate Defendants argue Plaintiff has not alleged sufficient facts satisfying the elements of a claim for IIED. ECF No. 20-1 at 21-23. Additionally, the remaining Corporate Defendants argue they are not liable for the actions of Pendergrass or Keeler because Plaintiff's allegations do not establish a sufficient basis for respondeat superior, given that he claims these CVS employees acted outside the scope of their employment. *Id.* at 22-23.

The Court finds the complaint, on its face, states a plausible IIED claim against Pendergrass. The allegations relating to Plaintiff's encounter with Pendergrass, which are summarized in the previous section of this order, create a reasonable inference that Pendergrass's intentional actions were sufficiently outrageous and extreme so as to cause Plaintiff severe emotional distress. *See* Amended Complaint at ¶¶ 81-82; *see generally Hansson*, 374 S.C. at 356, 650 S.E.2d at 70. Moreover, by virtue of the doctrine of respondeat superior and for the reasons explained in the

previous section of this order, the complaint states a plausible claim for IIED against the remaining

Corporate Defendants.  The Court therefore denies the motions to dismiss filed by Pendergrass and

the remaining Corporate Defendants.

As for Defendant Keeler, however, the Court finds the complaint lacks sufficient allegations

establishing his conduct toward Plaintiff was extreme and outrageous.  *See Hansson*, 374 S.C. at

356, 650 S.E.2d at 70 (stating the defendant's alleged conduct must qualify as "extreme,"

outrageous," "atrocious," and "utterly intolerable").  Plaintiff alleges that when he called CVS Store

#7386 and explained to Keeler the nature of his disability and desired accommodation, Keeler

laughed and denied Plaintiff's request.  Amended Complaint at ¶ 75.  Plaintiff also claims Keeler

became irritated, started talking in a loud, aggressive tone to him, insulted him with a racial slur,

and threatened to call the police on Plaintiff.  *Id.*  While these allegations certainly suggest

crudeness on Keeler's behalf, they do not rise to the level of extreme and outrageous conduct

necessary to state a claim for IIED.  *See Hawkins v. Greene*, 311 S.C. 88, 91, 427 S.E.2d 692, 694

(Ct. App. 1993) ("Facts which may show extreme insensitivity on the part of the defendant do not

necessarily establish the tort of outrage.");  *see also Gaiters v. Lynn*, 831 F.2d 51, 53 (4th Cir. 1987)

(stating liability for IIED "'does not extend to mere insults, indignities, threats, annoyances, petty

oppressions, or other trivialities'" (quoting Restatement (Second) of Torts § 46 cmt. d)).  The Court

therefore grants Keeler's motion to dismiss the IIED claim against him.

### C.    Civil Conspiracy

Plaintiff alleges a claim for civil conspiracy against the Above-Store and Store-Level

Defendants, and against the Corporate Defendants under a theory of respondeat superior.  Amended

Complaint at ¶¶ 278-92.  All defendants argue Plaintiff's state law civil conspiracy claim must be

54

dismissed because he fails to plead special damages in his complaint and does not allege the purpose of the conspiracy was to injure him.[27]  ECF No. 20-1 at 23-26; ECF No. 21-1 at 14; ECF No. 22-1 at 2-4.  Defendants also argue the intracorporate conspiracy doctrine bars Plaintiff's state law civil conspiracy claim for the same reason it bars his § 1985(3) conspiracy claim.  ECF No. 20-1 at 24.

Under South Carolina law, a plaintiff must allege three elements to state a claim for civil conspiracy: (1) a combination of two or more persons (2) for the purpose of injuring the plaintiff that (3) causes the plaintiff special damage.  *Hackworth v. Greywood at Hammett, LLC*, 385 S.C. 110, 115, 682 S.E.2d 871, 874 (Ct. App. 2009).  "A claim for civil conspiracy must allege additional acts in furtherance of a conspiracy rather than reallege other claims within the complaint."  *Id.* Moreover, because the essence of a civil conspiracy claim is the special damage resulting to the plaintiff, the alleged damages must exceed the damages alleged for the plaintiff's other claims.  *Id.*

"Special damages are those elements of damages that are the natural, but not the necessary or usual, consequence of the defendant's conduct."  *Id.* at 116, 682 S.E.2d at 875.  Unlike general damages, special damages "are not implied by law because they do not necessarily result from the wrong" and they must "must be alleged in the complaint to avoid surprise to the other party."  *Sheek v. Lee*, 289 S.C. 327, 329, 345 S.E.2d 496, 497 (1986).  If the plaintiff simply restates the damages from another cause of action and does not specifically allege special damages as part of his civil conspiracy claim, the court should dismiss the civil conspiracy claim.  *Hackworth*, 385 S.C. at 117, 682 S.E.2d at 875.

The Court finds Plaintiff has failed to adequately plead special damages for his civil conspiracy claim.  In his cause of action for civil conspiracy, Plaintiff simply realleges the same

---

[27]    Plaintiff's responses do not address Defendant's argument concerning special damages.

damages that he alleges in his claims for assault, battery, false imprisonment, and intentional infliction of emotional distress.  *Compare* ¶¶ 288-90 (damages alleged for civil conspiracy claim), *with* ¶¶ 229-30 (damages alleged for assault), ¶¶ 242-43 (damages alleged for battery), ¶ 252 (damages alleged for false imprisonment), *and* ¶ 273 (damages alleged for IIED).  Plaintiff's failure to adequately describe his special damage impedes the defendants' ability to litigate the civil conspiracy claim.  *See Sheek*, 289 S.C. at 329, 345 S.E.2d at 497.  Due to his insufficient pleading, Plaintiff's civil conspiracy claim fails as a matter of law, and the Court grants all defendants' motions to dismiss this cause of action.  *See Hackworth*, 385 S.C. at 117, 682 S.E.2d at 875 (affirming the circuit court's dismissal of the plaintiff's civil conspiracy claim because the plaintiff "repeated verbatim the same damages in its civil conspiracy claim as are alleged in its claim for breach of contract accompanied by a fraudulent act"); *Charleston Aluminum, LLC v. Samuel, Son & Co.*, No. CIV.A.3:05-02337MBS, 2006 WL 2370292, at *3 (D.S.C. Aug. 15, 2006) (dismissing the plaintiff's state law civil conspiracy claim because "the damages pleaded by [the p]laintiff in the civil conspiracy cause of action are duplicative of the damages asserted with respect to the contract causes of action").  Accordingly, the Court dismisses the remaining Corporate Defendants, the Above-Store Defendants, and the Store-Level Defendants from the cause of action for civil conspiracy.[28]

### D.    Negligence

Plaintiff alleges a negligence claim against the Above-Store and Store-Level Defendants,

---

[28]    The Court need not address Defendants' remaining arguments concerning whether Plaintiff alleges the purpose of the conspiracy was to injure him or whether the intracorporate conspiracy doctrine bars Plaintiff's claim. *Cf. Bailey v. Black Entm't Television*, No. CIVA 3:09CV787, 2010 WL 1780403, at *4 (E.D. Va. May 3, 2010) (declining to address the defendants' additional arguments in support of dismissal because the court found sufficient, independent grounds upon which to dismiss Plaintiff's claim under Fed. R. Civ. P. 12(b)(6)), *aff'd sub nom.*, 393 F. App'x 971 (4th Cir. 2010).

and against the Corporate Defendants by virtue of respondeat superior.  Amended Complaint at ¶¶ 293-306.  The defendants, interpreting Plaintiff's negligence claim as one based on premises liability, argue Plaintiff fails to state a claim because he does not allege (1) that they breached any duty or (2) that he suffered any physical injuries.  ECF No. 20-1 at 26-28; ECF No. 21-1 at 14; ECF No. 22-1 at 2-4.

    To establish a negligence claim, a plaintiff must show the defendant owed him a duty of care, the defendant breached that duty, and the plaintiff suffered a loss caused by the breach.  *Doe ex rel. Doe v. Wal-Mart Stores, Inc.*, 393 S.C. 240, 246, 711 S.E.2d 908, 911 (2011).  Negligence is the failure to exercise due care.  *Solanki v. Wal-Mart Store No. 2806*, 410 S.C. 229, 237, 763 S.E.2d 615, 619 (Ct. App. 2014).  Due care means the degree of care that a person of ordinary prudence and reason would exercise under the same circumstances.  *Berberich v. Jack*, 392 S.C. 278, 287, 709 S.E.2d 607, 612 (2011).  To state a claim for negligence under a theory of respondeat superior, the plaintiff must allege that the defendant's employee committed a tortious act against the plaintiff, that the defendant had and breached a duty to the plaintiff, and that the plaintiff suffered damages as a result of the breach.  *S. Carolina Ins. Co.*, 290 S.C. at 176, 177-83, 348 S.E.2d at 620-24.

    In his complaint, Plaintiff grounds his negligence claim on a theory of premises liability and characterizes himself as an invitee.[29]  *See* Amended Complaint at ¶¶ 296-98 (citing South Carolina case law dealing with premises liability and describing Plaintiff "as a business visitor, giving him invitee status").  Premises liability is a theory of negligence that establishes the duty owed to someone injured on a landowner's property as a result of conditions or activities on the land.  *See*

---

[29]    *See generally Rouse v. Duke Univ.*, 869 F. Supp. 2d 674, 679 (M.D.N.C. 2012) (stating "the allegations in the pleadings govern" and recognizing the principle that a "plaintiff 'is bound by the allegations contained in its complaint and cannot, through the use of motion briefs, amend the complaint'" (quoting *Zachair, Ltd. v. Driggs*, 965 F. Supp. 741, 748 n.4 (D. Md. 1997), *aff'd*, 141 F.3d 1162 (4th Cir. 1998))).

*Singleton v. Sherer*, 377 S.C. 185, 200, 659 S.E.2d 196, 204 (Ct. App. 2008). "An invitee is a person who enters onto the property of another by express or implied invitation, his entry is connected with the owner's business or with an activity the owner conducts or permits to be conducted on his land, and there is a mutuality of benefit or a benefit to the owner." *Lane v. Gilbert Const. Co.*, 383 S.C. 590, 596, 681 S.E.2d 879, 882 (2009) (internal quotation marks omitted). "[A]n invitee enters the premises with the implied assurance of preparation and reasonable care for his protection and safety while he is there." *Singleton*, 377 S.C. at 202, 659 S.E.2d at 205. The requisite degree of care depends on "the particular circumstances involved, including the age and capacity of the invitee." *Sims v. Giles*, 343 S.C. 708, 718, 541 S.E.2d 857, 863 (Ct. App. 2001).

There are two types of invitees: public invitees and business visitors. *Id.* at 717, 541 S.E.2d at 862. Plaintiff alleges he is a business visitor. Amended Complaint at ¶ 298. "A business visitor . . . is an invitee whose purpose for being on the property is directly or indirectly connected with business dealings with the owner." *Sims*, 343 S.C. at 717, 541 S.E.2d at 862. A property owner owes a business visitor "the duty of exercising reasonable or ordinary care for his safety, and is liable for injuries resulting from the breach of such duty." *Id.* at 718, 541 S.E.2d at 863.

The Court finds Plaintiff has stated a plausible claim for negligence, under a theory of premises liability, against Pendergrass. The allegations relating to the incident involving Pendergrass, the facts of which are summarized above, create a reasonable inference that she failed to exercise due care to ensure Plaintiff's protection and safety after he, a business visitor, explained to her his disability and "diagnosis of PTSD and PTSD-associated agoraphobia." Amended Complaint at ¶ 80; *compare id.* at ¶ 55 ("[Plaintiff]'s disability is such that anxiety and panic attacks overtake and adversely affect him when he encounters multiple unknown persons."), *with Sims*, 343

S.C. at 718, 541 S.E.2d at 863 (observing the requisite degree of care depends on "the particular circumstances involved, including the age and capacity of the invitee"). The complaint contains sufficient factual allegations indicating Pendergrass breached her duty when she summoned a crowd of at least four strangers to surround Plaintiff, the proximate result of which was to cause Plaintiff "to suffer a severe panic attack." *Id.* at ¶ 82; *see Singleton*, 377 S.C. at 202, 659 S.E.2d at 205 ("[A]n invitee enters the premises with the implied assurance of preparation and reasonable care for his protection and safety while he is there."). Accepting these assertions as true, the Court finds Plaintiff's complaint contains plausible factual statements supporting a reasonable inference that Pendergrass breached a duty to Plaintiff under a theory of premises liability and that he suffered injury as a proximate result. Moreover, under the doctrine of respondeat superior, the complaint states a claim for negligence against the remaining Corporate Defendants. The Court therefore denies the motions to dismiss filed by Pendergrass and the remaining Corporate Defendants.

However, because Plaintiff's complaint fails to allege facts creating a plausible inference that the Above-Store Defendants or the other Store-Level Defendants (all those besides Pendergrass) breached any duty—under a theory of premises liability—to Plaintiff, the Court grants these defendants' motions to dismiss Plaintiff's negligence claim against them.

### E.    Negligent Supervision and Retention

In his thirteenth cause of action, Plaintiff alleges claims for negligent supervision "and/or" negligent retention against the Above-Store and Store-Level Defendants, and against the Corporate Defendants by virtue of respondeat superior. Amended Complaint at ¶¶ 307-23. The defendants seek dismissal of these claims by arguing (1) Plaintiff has not alleged any actionable conduct against the individual defendants (the Above-Store and Store-Level Defendants), and as a result, the

59

remaining Corporate defendants cannot be held liable for negligently supervising or retaining them; and (2) Plaintiff has not alleged knowledge of a propensity to engage in misconduct.  ECF No. 20-1 at 28-29; ECF No. 21-1 at ; ECF No. 22-1 at 2-4.  Additionally, the Store-Level Defendants argue they cannot be sued for negligent supervision or retention because "'only employers are subject to liability for negligent hiring, supervision, and retention.'" ECF No. 21-1 at 15 (quoting *Sarvis v. The United Methodist Church of S. Carolina Conference*, No. 2004-CP-23-2766, 2005 WL 5337865 (S.C. Ct. Com. Pl. Greenville Cnty. Mar. 28, 2005)).

"In circumstances where an employer knew or should have known that its employment of a specific person created an undue risk of harm to the public, a plaintiff may claim that the employer was itself negligent in hiring, supervising, or training the employee, or that the employer acted negligently in entrusting its employee with a tool that created an unreasonable risk of harm to the public."  *James v. Kelly Trucking Co.*, 377 S.C. 628, 631, 661 S.E.2d 329, 330 (2008).  "[N]egligent hiring and negligent retention are distinct theories of recovery separate from negligent supervision." *Doe v. ATC, Inc.*, 367 S.C. 199, 205, 624 S.E.2d 447, 450 (Ct. App. 2005).  An employer cannot be liable for negligent hiring, retention, or supervision unless the employee has committed an actionable tort.  *Sabb v. S. Carolina State Univ.*, 350 S.C. 416, 431-32, 567 S.E.2d 231, 238-39 (2002) (Pleicones, J., dissenting) (collecting cases from other states and noting "the torts of negligent hiring, supervision, or training must include as an element an underlying tort or wrongful act committed by the employee").

### 1.    Negligent Supervision

To state a claim for negligent supervision, a plaintiff must allege an employer's employee intentionally harmed the plaintiff while the employee (1) was upon the premises of the employer or

was using a chattel of the employer; (2) the employer knew or had reason to know it had the ability to control its employee; and (3) the employer knew or should have known of the necessity and opportunity for exercising such control. *Degenhart v. Knights of Columbus*, 309 S.C. 114, 116-17, 420 S.E.2d 495, 496 (1992). Supervisory liability requires the court to focus on whether the employer knew or should have known about the specific conduct of the employee. *Rickborn v. Liberty Life Ins. Co.*, 321 S.C. 291, 302, 468 S.E.2d 292, 299 (1996).

### 2.     Negligent Retention

To state a claim for negligent retention, a plaintiff must allege the employer had knowledge of its employee's habit of prior wrongdoings, and despite the foreseeability of harm to third parties, the employer failed to terminate the offending employee before he caused the plaintiff harm. *Doe*, 367 S.C. at 205-06, 624 S.E.2d at 450-51. "The standard . . . is whether the employer knew the offending employee was in the habit of misconducting [himself] in a manner dangerous to others." *Id.* at 206, 624 S.E.2d at 450-51. "Accordingly, many courts have recognized that a plaintiff must demonstrate some propensity, proclivity, or course of conduct sufficient to put the employer on notice of the possible danger to third parties." *Id.* at 206, 624 S.E.2d at 451.

### 3.     Analysis

The Court finds that based on the incident involving Pendergrass, which involved intentional torts that occurred on CVS property, Plaintiff has stated plausible claims for negligent supervision and negligent retention against the remaining Corporate Defendants. Discovery can resolve the question concerning whether the Corporate Defendants knew or should have known Pendergrass had a propensity to engage in misconduct.

Regarding the Above-Store and Store-Level Defendants, however, the Court grants their

61

motions to dismiss for two reasons.  First, because Plaintiff has not alleged facts creating a plausible inference that the Above-Store or Store-Level Defendants qualify as employers, these defendants cannot be held liable for negligent supervision or retention.  *See Degenhart*, 309 S.C. at 116, 420 S.E.2d at 496 (specifying "[a]n *employer* may be liable for negligent supervision" (emphasis added)); *Doe*, 367 S.C. at 205-06, 624 S.E.2d at 450-51 (stating "the *master* may subject himself to liability" for negligent retention (emphasis added)).  Second, Plaintiff alleges no facts sufficient to satisfy the elements of a cause of action for negligent supervision or for negligent retention.  *See Degenhart*, 309 S.C. at 116-17, 420 S.E.2d at 496 (negligent supervision); *Doe*, 367 S.C. at 205-06, 624 S.E.2d at 450-51 (negligent retention).  Accordingly, the Court dismisses the Above-Store and Store-Level Defendants from the claims for negligent supervision and negligent retention.

>    **F.    Intentional Interference with Contract; Intentional Interference with Prospective Contractual Relations**

In his fourteenth cause of action, Plaintiff alleges claims for intentional interference with contract "and/or" intentional interference with prospective contractual relations against the Above-Store and Store-Level Defendants, and against the Corporate Defendants by virtue of respondeat superior.  Amended Complaint at ¶¶ 324-33.  All defendants argue the stranger doctrine bars both claims.  ECF No. 20-1 at 29-30; ECF No. 21-1 at 15; ECF No. 22-1 at 2-4.

To state a claim for intentional interference with contract—also known as tortious interference with contractual relations—a plaintiff must allege (1) the existence of a contract; (2) the defendant's knowledge of the contract's existence; (3) the defendant's intentional procurement of the breach of the contract; (4) the absence of justification; and (5) resulting damage.  *Camp v. Springs Mortgage Corp.*, 310 S.C. 514, 517, 426 S.E.2d 304, 305 (1993); *Webb v. Elrod*, 308 S.C.

445, 447, 418 S.E.2d 559, 561 (Ct. App. 1992).  To state a claim for intentional interference with

prospective contractual relations, a plaintiff must allege "(1) the defendant intentionally interfered

with the plaintiff's potential contractual relations; (2) for an improper purpose or by improper

methods; (3) causing injury to the plaintiff."  *Crandall Corp. v. Navistar Int'l Transp. Corp.*, 302

S.C. 265, 266, 395 S.E.2d 179, 180 (1990).

 While intentional interference with contract and intentional interference with prospective

contractual relations are distinct torts, they both require a plaintiff to show the defendant was a

stranger to both the contract at issue and the business relationship giving rise to and underpinning

the contract.  *See Dutch Fork Dev. Grp. II, LLC v. SEL Properties, LLC*, 406 S.C. 596, 604, 753

S.E.2d 840, 844 (2012) (discussing intentional interference with contract); *Santoro v. Schulthess*,

384 S.C. 250, 262, 681 S.E.2d 897, 903 (Ct. App. 2009) (discussing intentional interference with

prospective contractual relations).[30]  This principle, often called the "stranger doctrine," prevents a

party to an actual or prospective contract from being sued.  *See BCD, LLC, Rosen Campus I, LLC v.

BMW Mfg. Co., LLC*, No. 6:05-CV-2152-GRA, 2007 WL 128887, at *1-2 (D.S.C. Jan. 12, 2007)

(addressing state law claims for "tortious interference with contractual relations [and] interference

with prospective contractual relations" and observing "though South Carolina has not adopted the

'Stranger Doctrine' in name, the law as it exists provides comparable protection to that of the

'Stranger Doctrine'").

 The Court agrees with the defendants that the stranger doctrine bars Plaintiff's claims for

both intentional interference with contract and intentional interference with prospective contractual

---

[30] In *Santoro*, the South Carolina Court of Appeals cited *Renden, Inc. v. Liberty Real Estate Ltd. P'ship III*,
444 S.E.2d 814, 818 (Ga. Ct. App. 1994), a case that defines a "stranger" as "an 'intermeddler' acting improperly
and without privilege."

relations.  A fair reading of Plaintiff's complaint reveals no allegations suggesting the defendants were strangers to the alleged contractual relations at issue or to any business relationship giving rise to and underpinning the alleged contractual relations.  The only contractual relations with which Plaintiff claims the defendants interfered were his own alleged contractual relations with CVS, not with any third party.  *See* Amended Complaint at ¶¶ 326, 331.  As a result, Plaintiff cannot maintain a suit against any defendant for either type of tortious interference claim.  The Court therefore grants all defendants' motions to dismiss Plaintiff's claims for intentional interference with contract and intentional interference with prospective contractual relations.[31]

### G.    Unfair Trade Practices

Plaintiff brings a claim against the Corporate Defendants alleging they violated the South Carolina Unfair Trade Practices Act[32] (SCUTPA).[33]  The remaining Corporate Defendants seek dismissal of Plaintiff's SCUTPA claim, arguing he has neither sufficiently pled any unfair or

---

[31]    As to Plaintiff's claim for intentional interference with contract, the Court agrees with the defendants' argument that the complaint does not allege sufficient facts creating a reasonable inference that there was an existing contract between Plaintiff and any of the defendants.  *See* ECF No. 20-1 at 30-31.  Plaintiff has therefore failed to allege the first element—the existence of a contract—necessary to state a cause of action for intentional interference with contract.  *See Webb*, 308 S.C. at 447, 418 S.E.2d at 561.

[32]    S.C. Code Ann. §§ 39-5-10 to -560 (1985 & Supp. 2014).

[33]    At the hearing, the Court requested clarification from Plaintiff's counsel regarding the precise defendants against whom Plaintiff had brought the SCUTPA claim:

> THE COURT: [T]hat claim is made only against the [C]orporate [D]efendants, correct?
>
> ATTORNEY JOHNSTON: That is correct.  But, excuse me, Your Honor, all the [C]orporate [D]efendants, not the store or executive or whatever level, it's all the [C]orporate [D]efendants.
>
> THE COURT: Not the individual defendants.
>
> ATTORNEY JOHNSTON: *Not the individual named defendants, correct.*

Transcript at 92-93 (emphasis added).

deceptive trade practices nor sufficiently alleged any ascertainable loss of money or property.  ECF No. 20-1 at 31-33.

Section 39-5-140(a) of the SCUTPA "creates a private right of action in favor of '[a]ny person who suffers any ascertainable loss of money or property, real or personal, as a result of the use or employment by another person of an unfair or deceptive method, act or practice declared unlawful by § 39-5-20 [of the SCUPTA].'"  *Wright v. Craft*, 372 S.C. 1, 23, 640 S.E.2d 486, 498 (Ct. App. 2006) (first alteration in original) (quoting S.C. Code Ann. § 39-5-140(a) (1976 & Supp. 2005)).  To bring an action under the SCUTPA, a plaintiff must allege "(1) the defendant engaged in an unlawful trade practice; (2) the plaintiff suffered actual, ascertainable damages as a result of the defendant's use of the unlawful trade practice; and (3) the unlawful trade practice engaged in by the defendant had an adverse impact on the public interest."  *Bessinger v. Food Lion, Inc.*, 305 F. Supp. 2d 574, 579 (D.S.C. 2003), *aff'd*, 115 F. App'x 636 (4th Cir. 2004).

The Court agrees with Defendants that Plaintiff does not allege an ascertainable loss of money or property in his complaint.  The Court therefore grants the remaining Corporate Defendants' motion seeking dismissal of Plaintiff's claim under the SCUTPA.

## IX.    Declaratory and Injunctive Relief

Plaintiff seeks declaratory and injunctive relief in his sixteenth and seventeenth causes of action.  Amended Complaint at ¶¶ 357-63.  All defendants move to dismiss these causes of action.  ECF No. 20-1 at 33-4; ECF No. 21-1 at 16-17; ECF No. 22-1 at 2-4.

Because the Court dismisses the Above-Store Defendants from all causes of action asserted against them, the Court grants their motion to dismiss.  As to the remaining Corporate Defendants and the Store-Level Defendants, however, the Court denies their motions to dismiss because causes

of action are still pending against them.

## Conclusion

The Court **GRANTS** CVS Health Corporation's and Mark Cosby's motions to dismiss for lack of personal jurisdiction and **DISMISSES** them from all causes of action in Plaintiff's complaint. Regarding the remaining defendants and causes of action, the Court summarizes its ruling below and further clarifies this ruling in an attached chart. The Court

(1)    **DENIES** the remaining Corporate Defendants (South Carolina CVS Pharmacy, LLC and CVS Pharmacy, Inc.) and the Store-Level Defendants' motions to dismiss to Plaintiff's ADA claim; but **GRANTS** the Above-Store Defendants' motion to dismiss Plaintiff's ADA claim;

(2)    **DENIES** the motions to dismiss Plaintiff's § 1981 discrimination claim filed by the remaining Corporate Defendants and Store-Level Defendants Gates, Pendergrass, Sosa, and Keeler; but **GRANTS** the motions to dismiss Plaintiff's § 1981 claim as to the Above-Store Defendants and Store-Level Defendants Brescia, Cessna, Chisholm, Combs, McClure, Poland, Webb, John Doe #1, Jane Doe #1, and Jane Doe #2;

(3)    **DENIES** the motions to dismiss the § 1985(3) conspiracy claim filed by the remaining Corporate Defendants and the Store-Level Defendants; but **GRANTS** the motion to dismiss the § 1985(3) conspiracy claim filed by the Above-Store Defendants;

(4)    **DENIES** the remaining Corporate Defendants and Store-Level Defendants' motions to dismiss Plaintiff's § 1986 claim; but **GRANTS** the Above-Store Defendants' motion to dismiss the § 1986 claim;

(5)    **DENIES** the remaining Corporate Defendants' motion to dismiss Plaintiff's Title VI claim;

(6)    **DENIES** the remaining Corporate Defendants' motion to dismiss Plaintiff's Section 1557

66

claim;

(7) **DENIES** the remaining Corporate Defendants' and Pendergrass's motions to dismiss the assault, battery, and false imprisonment claims;

(8) **DENIES** the remaining Corporate Defendants' and Pendergrass's motions to dismiss the IIED claim; but **GRANTS** Keeler's motion to dismiss the IIED claim;

(9) **GRANTS** all Defendants' motions to dismiss Plaintiff's state law civil conspiracy claim;

(10) **DENIES** the motions to dismiss the negligence claim filed by the remaining Corporate Defendants and Pendergrass; but **GRANTS** the motion to dismiss the negligence claim filed by the Above-Store Defendants and all other Store-Level Defendants;

(11) **DENIES** the remaining Corporate Defendants' motion to dismiss the negligent supervision and/or retention cause of action; but **GRANTS** the Above-Store and Store-Level Defendants' motions to dismiss this cause of action;

(12) **GRANTS** all Defendants' motions to dismiss Plaintiff's cause of action for intentional interference with contract and/or prospective contractual relations;

(13) **GRANTS** the remaining Corporate Defendants' motions to dismiss Plaintiff claim under the South Carolina Unfair Trade Practices Act; and

(14) **DENIES** the remaining Corporate Defendants and Store-Level Defendants' motions to dismiss Plaintiff's causes of action for declaratory and injunctive relief; but **GRANTS** the Above-Store Defendants' motion to dismiss these claims;

In summary, the Corporate Defendants' motion to dismiss [ECF #20] is **GRANTED in part and DENIED in part**; the Store-Level Defendants' motion to dismiss [ECF #21] is **GRANTED in part and DENIED in part**; and the Above-Store Defendants' motion to dismiss [ECF #22] is

**GRANTED**.  The following defendants are dismissed from this case: CVS Health Corporation,

Mark Cosby, Paul Anderson, Shelly Edge, Ronald Elliot, Matt Lesniak, David Purdy, John

Robinson, and Darren Twedell.  For the sake of clarity, the Court provides an attached chart

summarizing which causes of action and respective defendants remain in this case.

     **IT IS SO ORDERED.**


September 29, 2015                        s/ R. Bryan Harwell
Florence, South Carolina               R. Bryan Harwell
                                        United States District Judge

| Cause of Action | Asserted Against | In | Out |
|---|---|---|---|
| **Americans with Disabilities Act** | All defendants | • Remaining corporate defendants<br>• Store-level defendants | • Above-store defendants |
| **42 U.S.C. § 1981** | All defendants | • Remaining corporate defendants<br>• Store-level defendants Gates, Pendergrass, Sosa, and Keeler | • Above-store defendants<br>• Store-level defendants Brescia, Cessna, Chisholm, Combs, McClure, Poland, Webb, John Doe #1, Jane Doe #1, and Jane Doe #2 |
| **42 U.S.C. § 1985(3)** | All defendants | • Remaining corporate defendants<br>• Store-level defendants | • Above-store defendants |
| **42 U.S.C. § 1986** | All defendants | • Remaining corporate defendants<br>• Store-level defendants | • Above-store defendants |
| **Title VI of the Civil Rights Act of 1964** | Corporate defendants | • Remaining corporate defendants | |
| **Section 1557 of the Affordable Care Act** | Corporate defendants | • Remaining corporate defendants | |
| **Assault** | Corporate defendants, Pendergrass, *and one or more John and Jane Doe defendants* | • Remaining corporate defendants<br>• Pendergrass | |
| **Battery** | Corporate defendants, Pendergrass, *and one or more John and Jane Doe defendants* | • Remaining corporate defendants<br>• Pendergrass | |
| **False Imprisonment** | Corporate defendants, Pendergrass, *and one or more John and Jane Doe defendants* | • Remaining corporate defendants<br>• Pendergrass | |
| **Intentional Infliction of Emotional Distress** | Corporate defendants, Pendergrass, Keeler, *and at least some of the John and Jane Doe defendants* | • Remaining corporate defendants<br>• Pendergrass | • Keeler |
| **Civil Conspiracy** | All defendants | | • All defendants |
| **Negligence** | All defendants | • Remaining corporate defendants<br>• Pendergrass | • Above-store defendants<br>• Store-level defendants Brescia, Cessna, Chisholm, Combs, McClure, Poland, Webb, John Doe #1, Jane Doe #1, and Jane Doe #2 |
| **Negligent Supervision and Retention** | All defendants | • Remaining corporate defendants | • Above-store defendants<br>• Store-level defendants |
| **Intentional Interference with Contract and/or Prospective Contractual Relations** | All defendants | | • All defendants |
| **SCUTPA** | Corporate defendants | | • Remaining corporate defendants |
| **Declaratory and Injunctive Relief** | All defendants | • Remaining corporate defendants<br>• Store-level defendants | • Above-store defendants |

## KEY

| Corporate defendants | (1) CVS Health Corporation <br> (2) South Carolina CVS Pharmacy, LLC <br> (3) CVS Pharmacy, Inc. |
|---|---|
| **Remaining corporate defendants** <br><br> (***This category excludes CVS Health Corporation, which is dismissed from all causes of action for lack of personal jurisdiction.***) | (1) South Carolina CVS Pharmacy, LLC <br> (2) CVS Pharmacy, Inc. |
| **Above-store defendants** <br><br> (***All Above-store defendants are dismissed from this case.***) | (1) Mark Cosby <br> (2) Paul Anderson <br> (3) Shelly Edge (improperly identified in the amended complaint as Renee Edge) <br> (4) Ronald Elliot (improperly identified in the amended complaint as Kevin Elliot) <br> (5) Matt Lesniak <br> (6) David Purdy <br> (7) John Robinson <br> (8) Darren Twedell |
| **Store-level defendants** | (1) John Brescia <br> (2) Joseph Cessna <br> (3) Harris Chisholm <br> (4) Travis Combs <br> (5) Ashley Gates <br> (6) Jim Keeler <br> (7) Ginny McClure <br> (8) Ida Pendergrass (improperly identified in the amended complaint as Natasha Pendergrass) <br> (9) Bill Poland <br> (10) Xiomata Sosa (improperly identified in the amended complaint as Xio Sosa) <br> (11) Susan Webb <br> (12) John Doe #1 <br> (13) Jane Doe #1 <br> (14) Jane Doe #2 |